# State of Vermont v. Lionel R. Goyet

[132 A2d 623]

February Term, 1957.

Opinion Filed May 7, 1957.

*Frederick G. Mehlman* for the respondent.

*Frederick M. Reed,* Attorney General, and *Charles E. Gibson, Jr.,* State's Attorney, Caledonia County, for the State.

**Adams, J.** The respondent was indicted by a grand jury in Caledonia County for murder in the first degree of Archie L. Webber. The respondent pleaded not guilty and not guilty by reason of insanity. He also filed a motion for a change of venue. This motion was granted and the case removed to Windsor County where it was tried by jury at the June Term, 1956. The verdict was guilty of murder in the first degree.

After verdict and before entry of judgment on the verdict, the case was passed to this Court on exceptions of the respondent.

■ The respondent has briefed his exceptions under headings of exceptions 1 to 23 inclusive, several of these headings containing more than one exception. There are other exceptions that are not briefed, so they are waived. *Strout* v. *Wooster*, 118 Vt. 66, 71, 99 A2d 689.

It will be helpful to make a general summary of the factual situation as disclosed by the evidence so that it may serve as what might be termed a background for the discussion of the questions and exceptions briefed.

About one thirty o'clock in the morning of September 14, 1955, an injured man was discovered by two people who were in an automobile driving northerly along U. S. Route 5 between Lyndonville and Barton. The body was lying on the westerly side of the highway and just off the edge of the hard surface where the so-called Sutton Road joined route 5. These two people called the State Police who came at once. The injured man, who was unconscious, was taken by ambulance to the hospital at St. Johnsbury where he died shortly after seven o'clock that morning. An autopsy was performed and it disclosed that the victim had been shot twice in the head and that one bullet had shattered into several pieces of lead, resulting in injury to the brain and causing death. It was a small caliber bullet. The victim was identified at the hospital by the doctor who first attended him upon admittance as Archie L. Webber and he was also identified by a nurse at the hospital. She was a sister of the victim.

An intense investigation was started by the State Police and enforcement officers. We detail some of the facts disclosed by that investigation that appeared in evidence at the trial. Robert Messier and his wife testified that on the evening of September 13 as they were travelling from Lyndonville to Barton on route 5, at about 10:30, they picked up a hitch-hiker and let him out at Barton at about 11 o'clock in front of the Valley residence where he was staying. Joyce Pickel, then of Barton testified that she was driving in an automobile on the evening of September 13 at about midnight and saw a hitch-

hiker on the train overpass just south of Barton who was dressed in a light sun-tan shirt and khaki pants and bare-headed. He was headed south toward Lyndonville; that she proceeded to Lyndonville where she met the party whom she intended to meet; that they then headed back to Barton and discovered the injured man; that they called the State Police. Two troopers learned these facts during the evening of the 14th when they were at Barton investigating the matter. They then went to the Valley residence late that evening. They found Mrs. Valley and Mrs. Goyet, the wife of the respondent there. A man was sitting in a chair watching television and he was dressed in sun-tan pants and shirt with the shirt outside of the pants. They asked him his name and he said it was Lionel Goyet. He was asked to step outside which he did. The troopers, because of a remark made to them by Mrs. Valley, removed from his person a belt, holster and gun. It was a twenty-two caliber 6-shot Sturm Ruger revolver. It contained 3 unexpended and 2 expended shells. There was one empty chamber. The 2 expended shells were to the right of the hammer position of the gun and the cylinder moves to the right as the gun is fired. The respondent was then arrested, handcuffed and taken in the automobile of one of the troopers to State Police Headquarters at St. Johnsbury.

While proceeding from Barton to St. Johnsbury, the trip taking 25 to 30 minutes, the respondent told the troopers about his actions during the evening of September 13 and all of the 14th until the troopers took him into custody that night. What he told them amounted to a verbal confession. Later at State Police Headquarters this confession was written out in more detail by one of the troopers, signed by the respondent on each page, witnessed by the two troopers who heard it and to whom he made the verbal statements in the automobile on the trip from Barton to St. Johnsbury. This written confession was introduced, subject to an objection and exception of the respondent.

Webber's pickup truck was parked on a side dirt road leading off route 5 and a considerable distance from the place where the body was found. There were town and country winter treads on the rear tires and the same type of a tire mark

was seen on the ground in the gravel where the body was found. The troopers also found a foot print where the truck was parked. A photograph and cast were made of this print. Marks shown on the heel thereof were similar to marks on the heels of the respondent's shoes.

## Exception 1

The first witness for the state, Joyce Pickel, testified that she left Barton for Lyndonville by automobile on the evening of September 13 at midnight and she saw a hitch-hiker going toward Lyndonville on a train overpass not far from Barton. She said that he had on a light suntan shirt and khaki pants and was not wearing a hat. She identified the respondent in court as the person whom she saw. She testified about discovering the body of Webber on the return trip from Lyndonville. When asked "By what route did you go to Lyndonville?" she replied, "I was going on route 5A". It was important for the state to show that the respondent was seen on route 5 and not on 5A as Webber's body was found on route 5. Later the examiner for the state, in taking up again with the witness the route by which she came south from Barton to Lyndonville, asked her, "Was it by route 5?" The witness was allowed to answer the question over the objection of the respondent that it was leading and an exception allowed. She answered, "Well, I am not too familiar with the routes, but I believe that route 5A was it." The form of a question on an objection that it is leading is a matter of discretion for the court. *State* v. *Bedard*, 65 Vt 278, 284, 26 A 719; *In Re Sawyer's Will*, 102 Vt 473, 478, 150 A 128. A ruling resting in the discretion of the trial court will not be reviewed here unless an abuse of discretion is shown and the contrary not appearing, it will be taken that the ruling was made as matter of discretion. *State* v. *Teitle*, 117 Vt 190, 195, 90 A2d 562. Any discretionary ruling is not subject to review here unless it clearly and affirmatively appears that such discretion has been abused or withheld. *Bigelow* v. *Denis*, 119 Vt 21, 25, 117 A2d 261. No abuse of discretion has been shown here.

Furthermore, the respondent was not prejudiced by the ruling. Error works a reversal only when the record

satisfies the court that the rights of the excepting party have been injuriously affected thereby. Supreme Court Rule 9; *Parker* v. *Hoefer*, 118 Vt 1, 10-11, 100 A2d 434, 38 ALR 2d 1216. In the instant case several other witnesses testified that they saw a hitch-hiker wearing a sun tan shirt and pants on route 5 southerly of Barton at about midnight and one of those witnesses identified the respondent in court as the hitch-hiker whom he saw. It also appears by uncontradicted testimony that the train overpass is on route 5 and there is none on route 5A. The ruling was without error.

### Exception 2

Early in the trial several photographs taken at the place where Webber's body was found were offered in evidence. They showed the body and various other objects. The trooper who took them testified that they accurately represented the terrain and the objects portrayed. The objection of the respondent was that they were irrelevant, immaterial and incompetent; that photographs are admissible only as an aid and guide and not to be received as direct evidence and there was nothing on the present state of the evidence to connect or associate them with the respondent. The state then offered to connect them up later and subject to that condition they were admitted and the respondent allowed an exception.

The respondent in his brief claims that to allow the photographs to be admitted as direct evidence at that stage of the trial was both an abuse of discretion which prejudiced the respondent and an error of law. The accuracy of the photographs was vouched for by the trooper who took them and no question is made in regard to that or about the subsequent connection of them with the respondent.

■ The order of the reception of evidence lies in the discretion of the trial court and unless there is an abuse of such discretion the ruling is not revisable here. *Perkins* v. *Vermont Hydro-Electric Corp.*, 106 Vt 367, 407, 177 A 631. No abuse of discretion has been shown here.

■ The respondent relies upon the case of *State* v. *Gravelle*, 117 Vt 238, 241, 89 A2d 111. It does not help him. There

the objection was to the verification of the photographs as correct representations of the locus at the time of the event in question. There, too, they were not offered as direct evidence but only in connection with the testimony of the witness who took them. In *Beattie* v. *Traynor*, 114 Vt 495, 501, 49 A2d 200, this Court held that there was no error in admitting a photograph that was received for the purpose of allowing the jury to make a comparison of the features and likeness of a person in the photograph with a boy in court. This was a suit in which paternity was involved. According to most decisions, a photograph is admissible in evidence, not merely as a map or diagram representing things to which a witness testifies from his independent observation, but as direct evidence of things which have not been directly described by a witness as having come from his observation. 20 Am Jur Evidence, §727, p. 608, note 20; See also 23 CJS, Criminal Law, §852; 3 Wigmore on Evidence, 3rd Ed. [Supp] p. 54-55. There was no error in admitting the photographs as direct evidence.

### Exception 3

State's Exhibit 15 is a wallet with its contents. It was found by the troopers under the body of Webber when he was removed from where he was lying beside the highway. When it was offered by the state, the respondent objected on the ground that it was immaterial, irrelevant and incompetent and, as the evidence then stood, there was nothing to connect it or associate it with the respondent and that there were contradictory social security numbers that apparently had not been investigated. The wallet contained twenty-nine cents in change, also a government social security card in Webber's name, an identification card made out in his name with a different social security number on it and also some receipts. The offer on behalf of the state was that, "State's 15 and its contents tend to establish the identity of the decedent. Therefore, tend to establish the *corpus delicti* and there will be further evidence offered tending to connect the decedent with the accused." Upon inquiry by the court, it was assured by the state that it expected to connect this matter with the respondent in some way by its direct case and the offer by the state of

the wallet was made in connection with that offer. It was admitted and the respondent allowed an exception. It should be noted that the offer by the state of the wallet was to establish the identity of the deceased victim and therefore tend to establish the *corpus delicti*. At common law—we have no statute on the subject—*corpus delicti* means the body of the crime and, as connected with a homicide, is made of two elements, first the death of a person, and second, that the death was produced through criminal agency. *State* v. *Longe*, 96 Vt 7, 10, 116 A 81; *State* v. *Crank*, 105 Utah 332, 142 P2d 178, 170 ALR 542, 549.

Here the offer of the wallet was only to establish the identity of the deceased, the death being an issue in the case. That was a part of the first element of the *corpus delicti*. The identity was further established from testimony of the doctor who treated him at the hospital and who was present at the autopsy and by the testimony of the nurse who was the victim's sister. The offer did not include the second element of the *corpus delicti*, that the death was produced through criminal agency, i. e., the cause of death.

■ The respondent says under this exception that because the state claims that the death was caused by the respondent while perpetrating a robbery and the wallet being material evidence on that issue it tended to prove the *corpus delicti*. Under V. S. 47, §8240, "murder committed * * * * in perpetrating or attempting to perpetrate * * * * robbery * * * * shall be murder in the first degree. All other kinds of murder shall be murder in the second degree." Therefore, the wallet and evidence in connection therewith applied to the degree of murder and not to the criminal agency producing death which was the revolver that produced the wounds resulting in death. *State* v. *Longe, supra,* 96 Vt at 10-13.

However, in reply to a direct question by the court, the state said that it expected to connect up the wallet and its contents with the respondent. It did this through the confession that we discuss later in this opinion. We also discuss under exception 9 the matter of the admission of exhibits upon the assurance by the state that they would be connected up by other

evidence so as to make them admissible. This exception is not sustained.

## Exception 4

This exception pertains to the admission of a sketch, Exhibit 16, made by a trooper of a foot print located where the Webber truck was discovered on a side road. It was objected to generally as not connected with the respondent. It was received subject to the connection being made. A plaster cast was made of the same print. This was also admitted, Exhibit 42, and a photograph of the same print, Exhibit 41, was also admitted. A pair of shoes, Exhibit 29, worn by the respondent at the time of his arrest was also admitted. These exhibits, 41, 42 and 29, were objected to by the respondent as irrelevant, incompetent and immaterial. These exceptions are not briefed so they are waived. *Strout* v. *Wooster, supra*, 118 Vt at 71, 99 A2d at 692. Testimony received without objection showed that there were distinctive markings on the rubber heels of the shoes and that the photograph and cast of the foot print showed similar markings. When the state offered to show that the sketch, exhibit 16, showed similar markings the respondent objected on the ground that the exhibit spoke for itself. His objection was sustained. In view of this he cannot now be heard to complain that the state failed to connect the exhibit with the respondent. Furthermore, with the other evidence in the case that we have referred to under this heading, no prejudice has been shown. The matter of comparison was left for the jury at the suggestion of the respondent. This exception is not sustained.

## Exception 5

This exception arose during the testimony of Dr. Spelman, the state pathologist, who performed the autopsy on the body of Webber. Before considering the exception, we must have in mind and refer to some of the evidence in the case. It later appeared in the trial that, when the troopers found the respondent at the Valley residence and took him into their custody, he had upon his person the 22 caliber revolver. It also appeared

that he had borrowed the revolver a few days before. In his confession he stated that he carried the gun on the night when he was hitch-hiking and was picked up by a man in a pickup truck who told him his name was Webber; that the respondent pointed the gun at Webber and told him to hand over his money; that he took his pocket book from his pocket and gave the respondent two one dollar bills and that the respondent then shot Webber twice in the head.

When Dr. Spelman was questioned by the state he described in detail the gun shot wounds in the head of Webber and the lead fragments found in the skull and within the brain. He was then asked about his experience in seeing wounds caused by pistols and hand guns, particularly of twenty-two caliber and spent projectiles of that caliber. He then was asked and stated that the projectiles and projectile fragments that he found were of small caliber. Counsel for the respondent then objected but no request was made to strike the answer. Counsel for the respondent then asked for the opportunity to cross-examine "before the answer is taken." That privilege was granted by the court. In reply to questions, the doctor then stated that all he could say was that it was a small caliber bullet. Upon direct examination being resumed by the state, the doctor again testified that it was a small caliber. He was then asked, "Could it have been a twenty-two caliber?" The respondent objected and the court excluded the question as speculative. No ground for the objection was stated by the respondent.

This is the exception briefed by the respondent. He briefs it upon the ground that it was leading and improper. No request was made for the court to tell the jury to disregard it. The court in excluding the question ruled in favor of the respondent. He has no cause now for complaint. He received all that he requested. However, in view of all the other evidence in the case about the caliber of the gun, the respondent's possession of it, his presence on the highway that night and use of that gun, the asking of the question has not been shown to be prejudicial. Supreme Court Rule 9. The exception is not sustained.

## Exception 6

This heading pertains to exceptions relating to the admission of certain photographs; State's exhibits 6 and 7, of tire marks at the place where the deceased was found and State's exhibits 11, 12 and 13 of the truck owned by the deceased where it was parked on the side dirt road. No question is made in regard to the verification of any of them. Exhibits 6 and 7 were offered as direct evidence of the objects shown. What we said under exception 2 in regard to the admissibility of photographs as direct evidence disposes of that ground of the exception as briefed adversely to the respondent.

The respondent claims that none of these exhibits were connected with the respondent as promised by the state when they were admitted. We take up further under the heading Exception 9 the matter of connecting up exhibits. However, the truck and the respondent were connected by his confession and other evidence in regard to his actions on the night in question. It will be shown in the course of this opinion that there was a great deal of evidence that connected the respondent with all the various phases of the crime and the evidence presented by the state. It is not necessary to detail it all here. Moreover, no prejudice is shown. The exception is not sustained.

## Exception 7

During the direct examination of trooper Marshall who was one of the troopers at the Valley residence on the evening of September 14, his attention was directed to the moment following the removal of the gun from the respondent's waist and he was asked if there was any communication between him and the respondent. Subject to objection and exception he was allowed to testify that he asked the respondent, "Do you know what we are here looking for you for?" and the reply was, "Yes." The respondent briefs this on two grounds, [1] That it should never have been admitted in the first place and [2] that the court should have stricken the question and answer and instructed the jury to disregard it. The answer was offered on the ground that it was a voluntary admission. The respondent makes no question about its being voluntary.

He says in his brief that he was entitled to a preliminary examination by the court before it was admitted. The answer is that he made no request for one. The preliminary examination by the court is for the purpose of determining if a confession is voluntary. *State* v. *Watson*, 114 Vt 543, 548, 49 A2d 174. When no question is made that it is not, no preliminary hearing is required. Such a hearing is required only when the question is properly raised. 20 Am Jur, Evidence, §534, p. 454. Admissions and statements by a respondent which, in connection with other evidence, warrant an inference of guilt are admissible in evidence, although they do not amount to a confession. *State* v. *Long*, 95 Vt 485, 490, 115 A 734. Here the statement was made by the respondent immediately after the troopers had taken from his person the gun with which he knew he had shot Webber. Without doubt he knew that it still contained the two expended shells left from the two shots that he had fired into Webber's head.

On the ground that it should have been stricken, his claim is that after a preliminary hearing, trooper Marshall being the witness, in regard to statements made by the respondent to the troopers in the automobile while on the trip from Barton to St. Johnsbury and the court was to rule as to those being admissible, he asked the court to strike the question and answer from the record that is the subject of the exception under discussion and instruct the jury to disregard it. The question and answer under consideration were testified to by trooper Marshall in the afternoon. The next morning at the preliminary hearing the same trooper testified to another question and answer that occurred on the porch immediately following the other one. Although the same trooper testified to both, the testimony was that the first question was asked the respondent by trooper Marshall who was testifying and the second one was asked the respondent by trooper Potvin. The record shows that the motion to strike applied to the question asked by trooper Potvin. The record is that the one under discussion to which this exception pertains was asked by trooper Marshall. He says that as the court ruled the conversations in the automobile were not admissible, it should have granted his motion to strike the other. Counsel admits in his brief that he was con-

fused in regard to the troopers, but claims that the record shows plainly what he meant. It is apparent that the court might have been confused by what counsel said and to which question and answer he was referring. We spend no time in further discussion which question and answer were meant. If it was understood by the court that the question and answer to which the exception pertains were meant, there was no error in not striking them. They were clearly admissible. No error appears.

### Exception 8

State's exhibit 27 was the gun, holster and belt taken from the respondent by the troopers. One of them testified that he delivered it to Lt. Nash, the District Commander of B. District, St. Johnsbury State Police Headquarters. Lt. Nash, as a witness for the state testified that Lt. Fletcher of the State Police and Superintendent of the Bureau of Identification and Records was present in the headquarters at St. Johnsbury. He was then asked, "Whether or not in your presence he saw State's Exhibit 27?" He answered, "He did." The respondent excepted and this is the one under discussion. The respondent briefs this on the ground that the question was improper as leading, suggestive and assumes a fact, and that it calls for a conclusion. We fail to see how the question could have been more properly framed. Lt. Fletcher was the next witness who testified for the state, testified that he received the gun, State's 27, from Lt. Nash, and examined it. He testified fully about its contents, its caliber, the five shells in it, three unexpended and the two expended ones, and their position in the cylinder. If we assume all that the respondent says in his brief about the question, certainly the respondent was not prejudiced by the question and answer. No error appears.

### Exception 9

While Lt. Fletcher was testifying, the state offered State's Exhibit 32, which was an envelope containing the three unexpended and two expended shells that Lt. Fletcher had removed from the gun. It developed from questions by respondent's counsel that something had been done to the very point of the lead on one of the unexpended shells about which Lt.

Fletcher knew nothing and that it had been done since he had seen it. Upon objection to their admission by respondent's counsel, counsel for the state and for the respondent went to the bench and there, out of the hearing of the jury, the court indicated that it felt that the state should produce testimony or an offer to show what the explanation was as to the condition disclosed by respondent's counsel. The counsel for the state, still at the bench, stated "The state believes that a chemical analysis of the composition of the projectile of one of the five [sic, evidently should have been three] unexpended cartridges was made by a chemist who determined whether or not the projectile material was similar to that of certain other objects removed from the person of Archie L. Webber. We would expect to offer some evidence on that." The court then said, still at the bench, "I think that in view of the question involved the state ought to at least present evidence of the transaction and show that it is or is not prejudicial, has no effect upon the status of the exhibit if they are otherwise offered." Subject to objection and exception of the respondent, the two expended and the three unexpended shells were admitted.

The respondent briefs the exception on the ground that one of the unexpended shells had been altered in some way and that the state's failure to fulfill its offer by showing the result of the chemical test or otherwise explain the alteration was harmful to the respondent.

Because the procedure in this case, in regard to exhibits when offered and received subject to further evidence or connecting evidence and the motion in regard thereto was unusual, this seems the opportune time to discuss it. As we have indicated in disposing of other exceptions certain exhibits were received subject to being, what is termed, connected up. The records show that the state offered forty three exhibits that were received and many of them were offered as soon as they were identified. The respondent in almost every instance objected, using as one ground of his objection that they had not been connected up with him.

 If the basis for the admission of evidence is not supplied or the conditions met and there is no motion to strike,.

the exception is waived and the testimony stands for consideration. *State* v. *Moquin*, 113 Vt 414, 415, 35 A2d 656. The reason for this rule is fully explained in *Scott, Admr.* v. *Bradford National Bank*, 107 Vt 226, 231, 179 A 149. In short, it is that the trial judge should not be required to carry the details of the evidence. Counsel should take the responsibility.

In the instant case, the transcript shows that after the evidence in chief for the state was closed, counsel for the respondent stated to the court that there had been many exhibits admitted subject to being connected up and because of the number of them, he, with the court's permission, would like to make a general objection to any such exhibit, on the basis that they were not in fact connected up and be protected by an exception to those rather than enumerating each one. The court then said, "You may have an exception as to each one so admitted, on the basis of your objection that they were not in fact connected up." It is apparent from this record that the court considered this motion as a motion to withdraw the exhibits from consideration of the jury. Counsel have so treated it in their briefs. By this unusual procedure, the court placed the burden upon itself rather than upon counsel in regard to the details of the admission of the exhibits, and thus by the denial of the motion it impliedly ruled that each exhibit had been connected up.

■ Coming back to the exception under consideration, there is nothing in the record to show that the state fulfilled its offer in regard to explaining the alteration in the one unexpended shell. The testimony showed that it had been cut or filed on the point of the lead. We must, therefore, inquire if its failure to do so was prejudicial, since error works a reversal only when it satisfies the court that the rights of the excepting party have been injuriously affected thereby. Supreme Court, Rule 9. He who alleges error has the burden of showing that he has been prejudiced thereby. *Loeb* v. *Loeb*, 118 Vt 472, 490, 114 A2d 518. The shells, both the expended and unexpended ones, were identified by marks that Lt. Fletcher had placed thereon. Marked as each one was, there could have been no substitution. Such a small detail as the fact that the very

point of the lead on one of the unexpended shells had been cut or filed could have been of no prejudicial effect. But of more weight is the fact that what was said by counsel and the court in regard to the change and the possible chemical analysis and the offer of explaining evidence was at the bench and not in the hearing of the jury. Certainly a jury could not be prejudiced by something that it did not hear. The exception is not sustained.

## Exception 10

The respondent briefs two exceptions under this heading. Both pertain to answers made by one of the troopers while testifying. The first has to do with Dr. Rowe taking a blood sample from the respondent's arm. Dr. Rowe testified that this was done at the Fitch Clinic during the mid-afternoon of September 15. The doctor testified without objection that trooper Potvin told the doctor in the presence of the respondent that they, the troopers, would like to have him draw some blood from the respondent for examination. The doctor then said to the respondent, "May I have your arm?" and the respondent voluntarily held out his arm. Later trooper Potvin testified that Dr. Rowe inquired of the respondent if he would be willing to let him have a blood sample. He was then asked what Goyet said and he replied, "I assume he said, yes." Upon request of respondent's counsel, that it was an assumption as a volunteered statement, the court ordered it struck from the record and told the jury to disregard it. The respondent asked for and was allowed an exception to the answer of the witness and claims that it was extremely prejudicial. The trooper directly after this incident testified about the doctor asking the respondent for the blood sample and that the respondent rolled up his sleeve and held out his arm and that he did it willingly and without any protest.

There was no hint or any suggestion that the respondent allowed the blood sample to be taken in any other manner than on a voluntary basis or that any coercion was used.

At another time when the same trooper was testifying and under cross-examination about his movements with the

respondent on the afternoon of September 15 and the sequence of events, he was asked about taking the respondent from jail to the State Police barracks and then asking the respondent some questions and to do something. The witness was then asked, "And you took him to the Fitch Clinic?" The witness answered, "We took him to re-enact the scene first." On request of respondent's counsel, the answer was stricken and the jury told to disregard it. Counsel asked for and was allowed an exception to the answer of the witness as a volunteered statement. The matter of the respondent going to the scene of the crime and telling the officers about it and showing them what was done was the very matter under discussion. After the offer by the state at the bench as to what the witness would testify to in regard to that and what was said to the respondent and what he did on that occasion, counsel for the respondent asked for the opportunity to examine the witness before the court ruled. The court then suggested to both counsel for the state and the respondent, still at the bench, that he would like to get the time straight and whether it was before or after the respondent was taken to the Fitch Clinic.

Respondent's counsel volunteered to ask the witness in regard to the time. Counsel for the state then asked, "Is this a preliminary hearing out of the presence of the jury?" Counsel for the respondent replied, "I don't see any need of it." He then cross-examined the witness, during which examination, the witness made the answer which is the subject of the exception. The answer of the witness was about the very matter under inquiry. It was not a volunteered statement about something else.

 The matter of giving unresponsive answers is largely in the hands of the trial court to be dealt with as justice may require. See *Symes* v. *Fletcher*, 95 Vt 431, 438-439, 115 A 502; *Sanders* v. *Burnham*, 91 Vt 480, 483; 100 A 905; *State* v. *Marsh and Buzzell*, 70 Vt 288, 298, 40 A 836. Here the court struck the answers and told the jury to disregard them. In its general charge, the jury was also told to disregard matters struck from the record. No prejudicial error has been established.

## Exception 11

This exception deals with the admission in evidence of the respondent's written confession. The court conducted a preliminary hearing, not in the presence of the jury, in connection with the admission in evidence of statements and admissions made by the respondent to troopers Marshall and Potvin while they were transporting him in the automobile from Barton to St. Johnsbury and also in regard to the admission of the written confession made to these same troopers after their arrival at State Police Headquarters in St. Johnsbury.

Previous to this preliminary hearing, it had already appeared in evidence from testimony of trooper Marshall before the jury, that he and trooper Potvin, in the late evening of September 14, went to Barton and, after interviews with several people, they went to the Valley residence. There they found the respondent dressed in sun tan pants and shirt with the shirt outside the pants. They removed the revolver, holster and belt from the waist of the respondent on the porch. Then in reply to the question asked by trooper Marshall, "Do you know what we are looking for you for?" The respondent replied, "Yes." He was arrested, handcuffed and rode with the troopers in the car of one of them to St. Johnsbury to State Police Headquarters. On this trip, he was asked some questions in connection with Webber's death; that he made some statements and volunteered some information. The troopers were armed but did not draw their weapons; that they made no threats or promises to the respondent or took hold of him in any way. At the St. Johnsbury office he was advised of the right to refrain from answering any questions and that what he said might be used against him. At the St. Johnsbury office, he was told of his right to have counsel. He was not told that it would be better for him if he answered the questions or that he would feel better if he did. He was cooperative and pleasant at all times and volunteered information without being asked.

At the preliminary hearing before the court, not in the presence of the jury, it appeared that on the porch at the Valley residence after the gun had been removed from the respondent and after trooper Marshall had asked the respondent if he

knew why they had come for him and he replied "Yes", that Trooper Potvin then said to the respondent, "Why did you kill him?" and the respondent replied, "I don't know." Following that Potvin told him that it would be necessary to take him to St. Johnsbury. It further appeared in evidence that after the troopers were in the car with the respondent, the respondent sitting on the front seat with Potvin who was driving, nothing was said for a few minutes until they were about a mile from the house. Marshall was riding on the back seat with a civilian by the name of Dailey, whom the troopers had taken with them as he knew people in Barton. They let Dailey out at the place where Webber's body was found so that he could drive Marshall's car back to St. Johnsbury.

The testimony was that, while they were in the car, none of them threatened the respondent or made any gestures toward him and that when they were about a mile from Barton, Marshall asked the respondent what happened and he told them in substance that he was AWOL from the Army and that earlier in the evening of the 13th he had hitch-hiked from Lyndonville to Barton and later from Barton towards Lyndonville. South of Barton he had received a ride in a pickup truck in a southerly direction toward Lyndonville. He didn't know the operator of the truck and had never seen him before. North of the junction of the Sutton road and U. S. 5 he decided that he would rob the operator of the truck and he told him it was necessary that he answer the call of nature and the operator pulled off the main highway at the junction of the Sutton road and U. S. 5. He, Goyet, went away from the truck and answered the call of nature and then returned to the truck. As he approached it, the door on the passenger side was open and the dome or interior light was in operation. He had the gun and pointed it at the operator and told him to hand over his money, which he did. Goyet then discharged the gun in the direction of the operator whose head was then turned slightly to the right and as the gun went off, the operator's head turned back forward and dropped slightly. He again shot in the direction of the operator.

He then said that he went to the operator's side of the truck, opened the door on the driver's side, pulled him out to

the ground, got into the truck and drove it to where he parked it. He was asked why he did it and he said that he didn't know. He took his shirt-tail and wiped off the steering wheel and walked across a field to route five and then southerly to Lyndonville Village. The following morning he went back to Barton on the mail bus. At about that point in his statement, they arrived at St. Johnsbury. The trip from Barton to St. Johnsbury took about twenty-five to thirty minutes.

The court at that time indicated that it would exclude this statement made by the respondent to the troopers in the automobile. It indicated that it would examine the question further before the state rested its case. The record does not show that the matter was again called to the attention of the court or that the state re-offered the testimony. The court gave no reason for excluding the testimony.

The preliminary hearing was then continued with reference to further statements of the respondent and the admission of the written confession. Troopers Marshall and Potvin both testified in regard to the events at St. Johnsbury and the writing of the confession and Potvin's testimony included the events from the time that they arrived at the Valley residence except the substance of the statements made by the respondent in the automobile.

Their testimony was in substance that when they arrived at headquarters in St. Johnsbury, they and the respondent went into Sgt. Ackerman's office and nobody was in it. Marshall then reported to Lt. Nash, after that he returned to Sgt. Ackerman's office where Potvin and the respondent were waiting. The three stayed there alone. The handcuffs were removed from the respondent by Potvin and the three sat down. Potvin then asked the respondent if he wanted an attorney and he said "No". He was then asked by Potvin if he would tell in detail what he had told in the car so that it might be put down on paper and he said he would. He was told it could be used against him in court. He then told the events in much more detail than he had told them in the car. As he recited them, Potvin wrote the account in substance as Goyet told it, but not attempting to use the exact words. He started writing the statement at five minutes of twelve and, during the process,

both troopers and the respondent had cigarettes that each helped himself to from a pack belonging to Marshall that he laid on the desk. They also had coffee that Potvin asked Akerman to make for them and which he brought to the door.

The statement filled nine sheets of lined paper and was written in longhand. When Potvin finished writing it, he took it to Lt. Nash to read. He read it and Potvin then returned to the room where Marshall and Goyet were waiting. Potvin asked Goyet if he could read and he said "Yes". Potvin then asked him to read the first page aloud so he could be certain that Goyet could read Potvin's writing. After he had read the first page aloud Potvin asked him to read the remainder to himself. After he had done that, Potvin asked him if it was the story as he had told it and he said "Yes". He was then asked to sign and date each page which he did in the presence of each trooper and each of them signed his name as a witness on each page and that was done in the presence of Goyet. About two and one-half hours elapsed from the time Goyet started to give the statement until it was completed, signed and then delivered to Lt. Nash. After this, the respondent was taken to the county jail at St. Johnsbury and left there.

Both troopers testified that during the entire time that they were with the respondent in the car during the trip from Barton to St. Johnsbury and were with him at headquarters in St. Johnsbury, they made no threats or promises to him; did not touch him in any way; did not raise their voices to him; did not draw their weapons; did not suggest nor say to him that it would be better for him to tell them what happened nor suggest that he would feel better if he did tell them and that he volunteered the information readily.

When the written confession was offered as an exhibit, the respondent objected to it on the ground that it was obtained without advising the respondent of the crime with which he was charged or that he was under arrest for first degree murder; that the respondent was not advised that he had the right to refuse to answer questions; not advised of his right to have counsel and in fact did not have the benefit of counsel; that he was not informed of the consequence of signing such a state-

ment or taken before a magistrate as the law requires. The court admitted it and allowed the respondent exceptions on all grounds.

 The basic test in connection with the admission of a confession is;—Was it voluntarily given? Is there any evidence of threats, promises or course of conduct that tends to show that the confession was not a voluntary act? *State* v. *Watson*, 114 Vt 543, 550, 49 A2d 174; 22 CJS, Criminal Law, §817. This question is a preliminary one for the determination of the trial court. Unless it can be said as a matter of law that the decision was wrong, it must stand. *State* v. *Blair*, 118 Vt 81, 85, 99 A2d 677. The court, by admitting the confession after hearing evidence of the circumstances attending the giving of it, impliedly held that it was voluntarily given. *State* v. *Blair, supra,* at page 89.

No evidence has been called to our attention, nor do we find any, that there were any threats or promises made or given in connection with the statements made by the respondent in the car or in connection with the confession made at headquarters at St. Johnsbury. So far as any direct evidence is concerned, it is clear that the act of the respondent was voluntary. In fact, the confession itself states that it is given freely and voluntarily without any threats or promises being used or given and knowing full well that it may be used in a court of law. It appeared from the evidence that the respondent was twenty-one years old; that he had two years of high school education and had been in the army three and one-half years.

The respondent, however, relies upon certain circumstances in maintaining that the confession should not have been admitted. He says that a reading of the entire transcript makes it overwhelmingly clear that the state could never have obtained a conviction of first degree murder if it were not for the confession and that it is upon the confession that the life of the respondent depends. Manifestly, that is no reason for its rejection or admission as a matter of law. It only goes to the care with which the facts surrounding the giving of it should be scrutinized. We have read the transcript not once but several times.

■ The mere fact that a person giving a confession is under arrest charged with a crime does not make it inadmissible. Nor is the rule changed because, under those circumstances, the confession was given to an officer in authority. Nor does the mere fact that the confession was made by the accused who had no counsel and had not been advised of his rights render it involuntary. *State* v. *Watson, supra,* 114 Vt at 549, 49 A2d at 178, and cases cited.

■■ The fact that the defendant was in custody of the officers when he confessed did not render the confession inadmissible, nor that he was without legal counsel, nor that he was taken to another county for questioning in the absence of a showing that anything occurred in transit that would have influenced the defendant, either by inducement or fear, to make the confession. *State* v. *Layton,* 174 Or 217, 148 P2d 522. A confession is not rendered inadmissible, although made while the accused is in prison, to an officer in authority, or in the absence of friends or counsel, it appearing that no threats or promises were made. *State* v. *Gorham,* 67 Vt 365, 367, 31 A 845.

■ A confession is not rendered inadmissible merely by the fact that it was obtained by an undue delay between arrest and the time when the accused was brought before the court. 22 CJS, Criminal Law, §817, p. 1431, note 72; 20 Am Jur, Evidence, §499, p. 432. V. S. §2076, cited by the respondent in that connection, applies only to a person arrested without warrant for misdemeanors. It does not apply here.

■ In the absence of a statute to the contrary, a voluntary confession is not rendered inadmissible because it was made without the accused having been cautioned or warned that it might be used against him, or because he was not advised of his constitutional or legal rights, such as his right to remain silent or his right to consult counsel or the effect of his confession or the magnitude of his crime. 22 CJS, Criminal Law, §322; 20 Am Jur, Evidence, §505, p. 435.

The respondent lays great stress upon the word "mere" as used in *State* v. *Watson, supra.* He argues that merely one

circumstance may not make a thing so, but several taken together change the result from the negative to the positive. This argument is not persuasive. It is only an attempt to establish the fact that when two or more rights are put together the result makes a wrong. It is equal to saying that several zeros when added make a whole number.

The respondent relies upon *McNabb* v. *United States*, 318 US 332, 63 S Ct 608, 87 L Ed 819 and *Upshaw* v. *United States*, 335 US 410, 69 S Ct 170, 93 L Ed 100, in both of which it was held that the confessions should not have been admitted. Both were prosecutions in the Federal Courts for violations of the Federal Law. Neither of them was decided upon constitutional grounds. The majority opinion in the McNabb case at page 340 states, "In the view we take of the case, it becomes unnecessary to reach the constitutional issue pressed upon us." In the Upshaw case it was held by the majority opinion at pages 412-413 that "this case falls squarely within the McNabb ruling" and in that case "there were confessions induced by illegal detention". The Upshaw confession for that reason was held inadmissible. In both of these cases there was a long delay in taking the prisoners before a magistrate which was contrary to the federal statutes and it seems from the majority opinions that was the foundation upon which those opinions were based.

Both of those cases were much different factually from the instant case. In the McNabb case, the petitioners were convicted in the District Court for the Eastern District of Tennessee for the murder of an officer of the Alcohol Tax Unit of the Bureau of Internal Revenue. The petitioners were Tennessee mountaineers, residents of the McNabb settlement where they had lived all their lives, none had gone beyond the 4th grade in school. Two of them were put in a barren cell at three o'clock in the morning; kept here for fourteen hours; given some sandwiches and not permitted to see friends or relatives who attempted to see them. They were then subjected to unremitted questioning for two days by numerous officers. The third petitioner was questioned four or five hours and denied any connection with the crime. He was later confronted with a statement from the others that accused him of firing both shots. He then said, "If they are going to accuse me of it, I

will tell the whole truth, you may get your pencil and paper and write it down." He then confessed to firing the first shot but denied firing the second. They were all then questioned by the officers in relays, sometimes separately and sometimes together until about two o'clock the next morning when the officers finally "got all the discrepancies straightened out."

In the Upshaw case *supra*, 335 US 410, 69 S Ct 170, 93 L Ed 100, the petitioner was held for thirty hours without having been brought before a committing magistrate as required by the Federal Rules of Criminal Procedure. At the end of that time he confessed. The reason for the delay given by the arresting officers was that there was not enough evidence to hold him and the police wished to question him further.

The respondent also relies upon *Watts* v. *Indiana*, 338 US 49, 69 S Ct 1347, 93 L Ed 1801; *Turner* v. *Pennsylvania*, 338 US 62, 69 S Ct 1352, 93 L Ed 1810, and *Harris* v. *South Carolina*, 338 US 68, 69, 69 S Ct 1354, 93 L Ed 1815. In each of these cases it was held by a majority of the court that the manner in which the confessions were obtained violated the due process clause of the Fourteenth Amendment and they should not have been admitted and the convictions were reversed. A review of the factual situation in connection with the manner in which the confession in each case was obtained shows conclusively that they are not in point here.

The Watts case was a capital case, the petitioner was arrested on a Wednesday, on suspicion of murder in the course of a criminal assault on a woman who was found dead. He was questioned at State Police Headquarters from about 11:30 that night until between 2:30 and 3:00 o'clock the following morning. The same procedure of persistent questioning from about 5:30 in the afternoon until about 3 o'clock the following morning was pursued by relays of officers on Thursday, Friday, Saturday and Monday and about 3 o'clock on Tuesday morning he made an incriminating statement. The prosecutor who had been called in then took the accused in hand. In addition to the foregoing it appeared that for the first two days the petitioner was kept in solitary confinement in a cell that was aptly called "the hole" in view of its physical condition. The law in

Indiana required that the petitioner be given a prompt preliminary hearing before a magistrate.

The Turner case was a capital case. The petitioner was arrested on suspicion and held for five days without arraignment. Meanwhile he was questioned, sometimes both day and night, by relays of police officers. During that time he was falsely told that other suspects had "opened up" on him. On the fifth day the questioning began in the afternoon and finally, at about eleven o'clock, he stated that he had killed the person for whose murder he was later arraigned. The next forenoon the police officers reduced his confession to writing. The district attorney admitted that a hearing was withheld until interrogation produced a confession. The delay of five days thus accounted for was in violation of a statute which required that arrested persons be given a prompt preliminary hearing.

The Harris case was a capital case. After two and one-half months of investigation suspicion was finally directed toward the petitioner by reports that he possessed a pistol and had left Aiken County, South Carolina, where the murder occurred, for Nashville, Tenn. The sheriff of Aiken County obtained a warrant, ostensibly for the purpose of arresting the petitioner for the theft of his aunt's pistol, but actually to secure his return from Nashville. The petitioner was an illiterate negro. He was arrested in Nashville on Friday and returned to Aiken County and lodged in its jail on Sunday. No warrant was read to him nor was he informed of the charge against him. On Monday afternoon he was questioned briefly by the sheriff and the jailer. On Monday night the questioning began in earnest, at least five officers worked in relays, relieving each other from time to time to permit respite from the stifling heat of the cubicle in which the interrogation was conducted. On Tuesday and Wednesday nights the same procedure was followed, with the Chief of the State Constabulary and half a dozen of his men taking over for an hour on Wednesday afternoon. During the questioning on Wednesday night the sheriff threatened to arrest the petitioner's mother for handling stolen property. The petitioner replied, "don't get my mother mixed up in it and I will tell you the truth." He then stated in substance what appeared in the confession that was introduced at

the trial. During the whole period the petitioner was denied the benefit of consultation with family and friends.

The respondent also relies upon *Herman* v. *Claudy*, 350 US 116, 76 S Ct 223, 100 L Ed 126. There Herman pleaded guilty in a Pennsylvania State Court to eight charges of burglary, twelve of larceny, eight of forgery and two of false pretenses. He was sentenced to serve seventeen and one half to thirty five years in the state penitentiary. Later he brought a petition for a writ of habeas corpus before the same court in which he was sentenced. He asked that his conviction be set aside as in violation of the due process clause of the Fourteenth Amendment. He alleged that his plea was the result of coercion and duress on the part of the state officers as well as setting forth other allegations. The District Attorney filed an answer denying some of the allegations and challenging the materiality of others. The court summarily dismissed the petition without hearing. The Supreme Court of the United States said that the petition and answer set forth contradictory facts and the petitioner was entitled to a hearing so that the truth of the allegations could be determined and he could not be denied a hearing merely because the allegations were disputed by the prosecuting officers. The case is not in point here.

In *United States* v. *Mitchell*, 322 US 65, 64 S Ct 896, 88 L Ed 1140, the record showed that Mitchell promptly and spontaneously admitted his guilt within a few minutes after his arrival at the police station. After that he was held illegally for eight days. There it was held that the subsequent illegal detention did not render inadmissible his prior confession.

On the facts that have been fully set forth herein, there was no evidence tending to show that the confession was not voluntarily given. In fact, the evidence is that it was so given. We cannot say, as a matter of law, that the decision of the trial court in admitting it was wrong. *State* v. *Watson, supra*, 114 Vt at 550, 49 A2d at 178; *State* v. *Blair, supra*, 118 Vt 81, 85, 99 A2d 677; *State* v. *Long*, 95 Vt 485, 490, 115 A 734.

### Exception 12

This exception pertains to the admission of a sample of blood, State's exhibit 20, taken by Dr. Rowe from the arm of

the respondent at the Fitch Clinic during the afternoon of September 15th. We set forth the circumstances under which it was taken, in considering exception 10, and there stated there was nothing in the evidence to show that it was not on a voluntary basis as pertaining to the respondent. The blood was used for testing its type for comparison purposes with blood taken from Webber's body and also with the type of human blood found on some of the respondent's clothing and on the ground where Webber had bled where his body was found. It appeared that the respondent's blood was type A and Webber's blood was type O. The respondent objected on the ground that the blood was taken from the respondent in direct violation of his constitutional rights. He briefs this upon the same grounds and raises the same questions that he did under exception 11 in regard to the admissibility of the confession. He relies upon the same cases. What we said there, and the authorities cited there, disposes of this exception adversely to the respondent. See *Breithaupt* v. *Abram*, 352 US 432, 77 S Ct 408, 1 L Ed 2d 448.

## Exception 13

Trooper Potvin was allowed to testify, subject to a general objection of the respondent, in regard to the respondent re-enacting, during the afternoon of September 15, the circumstances of the alleged crime. Before he was allowed to describe what was done by the respondent during the re-enactment, he was fully questioned by counsel for the state and the respondent in regard to the circumstances leading up to this re-enactment. It appeared from his testimony that the respondent was not threatened or coerced in any way; that no promises were made to him and that he did it willingly, in fact he was asked if he was willing to do it and said that he was. None of this testimony was contradicted in any manner. The respondent briefs this exception on the same grounds that he briefed exceptions 11 and 12 and relies upon the same cases as there relied upon. What we said in disposing of exception 11 and the authorities there cited dispose of this exception adversely to the respondent.

## Exception 14

Before any testimony was taken, the court made an order excluding all witnesses, except the one testifying, from the court room during the course of the proceedings. This applied to the witnesses for the state at the request of the respondent and to the witnesses for the respondent at the request of the state. V. S. 47, §2478, so far as material here, provides; "On the trial of a person for a criminal offense * * * * on the request of the prosecuting attorney or the party accused, the court shall have the witnesses examined separately and apart from each other."

Before the state had completed its direct case, it requested that Dr. Forrest, a psychiatrist who had examined the respondent at the Vermont State Hospital, and whom the state expected to use as a witness, be allowed to be present during the examination and testimony of the respondent's witnesses. In the discussion of this request with the court, the respondent requested that Dr. Forrest's file or memoranda made at his interviews with the respondent be made available to the respondent before the doctor heard any background testimony. The court kept the exclusion order in effect until the close of the state's direct case.

After the state had closed and completed its direct case and the court had disposed of certain motions, it made the following ruling: "We further rule that Dr. Forrest's file having been available to the respondent for study, he may be present during the examination of the witnesses for the respondent up to the time of the introduction of psychiatric testimony, at which time the court suggests to counsel that the situation be reviewed by both sides, and the respondent may be allowed an exception to this ruling on all grounds." The record shows that the exclusion rule was again put into effect as to Dr. Forrest before any psychiatrist testimony was introduced by either the respondent or the state and the doctor was excluded before such testimony was received.

(24) It is apparent from the foregoing that the respondent waived such right, if any, that he had to have the exclusion order remain unchanged in regard to Dr. Forrest. He made a

request of the court that, before Dr. Forrest be allowed to hear any testimony, the doctor's file or memoranda be made available to him. The court made the change in the ruling because of that request and the fact that the request had been complied with. He is in no position to insist upon the enforcement of the order after having had the benefit of the request that he made. In connection with the waiver, we call attention to the fact that the record shows that when Dr. Forrest was called by the state to testify the respondent made no objection to letting him testify.

We are not called upon to discuss or pass upon the discretion of the court in regard to the exclusion order pertaining to witnesses and allowing a witness to testify after an order excluding witnesses has been made. See *State* v. *Rosenberg*, 88 Vt 223, 230-231, 92 A 145 decided in 1914 when the statute, then P. S. 2344, was exactly the same as now, V. S. 47, §2478.

## Exception 15

At the close of the state's case in chief, the respondent made a motion that the indictment be dismissed or in any event that it be reduced to charge only murder in the second degree. This motion was denied. He waived his exception by proceeding with his case after the denial of his motion. *State* v. *Demag*, 118 Vt 273, 274, 108 A2d 390. The motion was renewed at the close of the respondent's case. It was again denied and an exception allowed. At the close of all the evidence, the respondent made a further motion for a directed verdict of not guilty and further that the charge be reduced to murder in the second degree. Various grounds were stated at length in the motion. The motion was denied and the respondent allowed exceptions on all grounds stated.

The respondent claims in his brief (a) "The alleged confession and re-enactment were not competent evidence and without them the state had nothing on which to base a demand for first degree murder." We have held that both were properly admitted. His ground (b) is, "They (referring to the confession and re-enactment) constituted the only evidence of a robbery which brings the case so far as a charge of murder in the

first degree is concerned within the rule that an extra-judicial confession alone and uncorroborated is insufficient." He claims that there was no corroboration of the confession in respect to the robbery.

In this jurisdiction, murder committed among other means "by wilful, deliberate and premeditated killing, or committed in perpetrating or attempting to perpetrate" among other felonies robbery "shall be murder in the first degree." V. S. 47, §8240.

In discussing this matter it becomes necessary to mention some parts of the confession. It detailed what the respondent did and where he went during the day and into the evening of September 13 and that he rode in a truck from Lyndonville to Barton that evening with some people who lived in Barton and that he got out just below the house where he lived. We now quote some of the material parts: "I was trying to make up my mind whether to go back to Fort Devens, Mass., as I am A.W.O.L. and have been since Aug. 28, 1955. I got down as far as the Esso station on the right and having made up my mind that I was going back to Fort Devens, Mass., I turned around and started hitchhiking towards St. Johnsbury. When I left home on Sept. 13, 1955 I was carrying a 22 caliber revolver 6 shot Ruger, single six, which I had borrowed from Oscar Priest on Sept. 7, 1955. * * * *

"I carried the gun when I left home on the 13th of Sept. up until the time I was picked up by the State Police Sept.14, 1955 at about 11:20 P. M.

"I walked from the Esso Station to about 200 yards north of Leon Valley's house and hitch-hiked until about ten minutes after the train went by. The train comes from Montreal P. Q. and goes to Boston, Mass. The train is due in Barton at about 12:15 a. m. A fellow came along in a pick up truck and picked me up. There was one fellow alone in the truck which I believe was dark green and had some sideboards on it. We came along towards St. Johnsbury. The fellow talked mostly about his experiences while in the Army. He asked me my name and I told him, he told me his name was Webber. He didn't tell me his first name. When we got near West Burke there were some

heifers in the road so Webber drove to the farm and woke the farmer up and told him about it.

"After this we continued on towards St. Johnsbury. * * * * As we were coming down the big hill north of the Sutton turn I told Webber to stop as I wanted to urinate (note word substituted in place of word used by respondent).

"When we got to the Sutton turn Webber pulled over in the turn out and stopped the truck. Webber didn't get out of the truck but waited with the motor running and lights on. I got out of the truck and urinated. (Note, again a substituted word used). Webber turned the light on inside the cab after I urinated. (Note, again a substituted word used).

"I pulled my gun out and pointed it at Webber and told him to hand over his money. Webber said 'I don't have much but you can have it'; Webber took his pocket book from his back pocket and handed me two (2) One (1) dollar bills. Then I shot him twice. I think the first shot hit him near the temple on the right side of the head. He bent his head down and moaned a little bit and I shot him again. I think the second shot hit him in the head.

"After I had shot him the second time I walked around the back of the truck to the driver's side, opened the door and took hold of Webber by the shirt and pulled him part way out of the truck and then dropped him. I got into the truck and took off at a pretty good speed. After I had gone about 200 yards I met a car going north. I drove along at a pretty good speed to a short cut from Rte. 5 to Lyndon Corners. This is a dirt road. I parked the truck beside the highway and left it after turning off the lights and motor. I got out of the truck and did the best I could at wiping off the fingerprints in the truck with my shirt tail. I walked across the field and came onto Route 5 on the north end of the bridge near the creamery and walked down the sidewalk on Main St. to my brother's home. My brother's name is Romeo Goyet. I knocked on the door and my sister-in-law Althea came to the door and let me in.

"Althea asked me if I was going to stay the rest of the night and I said 'Yes'. She also asked me if I was on my way to Barton. I said I was going up on the morning bus. I made a cup of instant coffee and while I was drinking it I noticed the

clock and the time was 1:45 a. m. After I finished my coffee I went to bed and got up at about 9:45 a. m. I had coffee and then called Edmunds Pharmacy and asked what time the bus left for Barton. They told me at 11:20 a. m. I got cleaned up and then walked down street with my sister-in-law.

"I bought the bus ticket with some of the money I had stolen from Webber. The ticket cost either eighty three or eighty seven cents. I took the bus and rode to Barton and got out at the Post Office. I walked from the Post Office to the Corner Store and bought a six pack of Ruperts Knickerbocker beer and a package of Lucky Strike cigarettes. I spent the rest of the money I had stolen from Webber paying for the cigarettes and beer.

"I then went up in the woods back of the house and drank all of the beer. I didn't drink all of the beer, just some from each bottle. I went home and my wife wasn't there so I went over to my aunt Rosalie Valley's and listened to the ball game on the radio. * * * * My wife and aunt came back about 3:15 p. m. and I went home with my wife. When we got back home my wife asked me why I didn't go back to camp. I told her I wasn't going back right off. She asked why. I told her 'Something happened.' She asked me 'What' and I told her she would find out soon enough. I left the house * * * * (then follows in detail what he did during the rest of the afternoon and later). I went back to the house and stayed there until the State Police officers came. When I was riding with Webber, I decided to rob him while we were coming down the long hill just north of where we parked when I shot him. I decided to shoot him after he handed me the money. I have read the foregoing statement consisting of nine pages and state the same to be true to the best of my knowledge and belief."

(Signed) Lionel R. Goyet Sept. 15, 1955

The wallet, State's Exhibit 15, admitted to establish the identity of Webber, was found under his body. A witness for the state testified that she worked at Edmund's Pharmacy at Lyndonville and sold a bus ticket from there to Barton in the forenoon of Sept. 14; that this person paid her eighty three cents for the ticket, handing her a one dollar bill; that it was the

only ticket to Barton that she sold that forenoon and that the person waited for the bus quite a while. From seeing his picture in the paper and seeing him in court, she identified the respondent as the man to whom she sold the ticket.

The bus driver testified that only one passenger boarded the bus at Lyndonville at 11:30 on the morning of Sept. 14 and this man got off at the Post Office at Barton. He identified the respondent in court as that person.

The proprietor of a grocery store at Barton testified that he had known the respondent for about five months previous to Sept. 14 and on that afternoon between 12:30 and 1:30, the respondent purchased a six pack of Schaeffer beer and a package of cigarettes and paid for them with two one dollar bills. The sister-in-law of the respondent testified about the respondent coming to her house at about quarter of two in the morning on Sept. 14 and staying there until the next forenoon; that he called the Pharmacy to inquire about the time the bus left; that they walked down street together and he was wearing the blue shirt that he had on under the sun tan shirt the night before and had the sun tan shirt in a paper bag; that he went into Edmunds' Pharmacy to catch the bus and she later saw him standing in the window. The testimony in regard to the respondent having the revolver on him when arrested and the shells in it has already been covered in discussing other exceptions. Without going into further details, we add that the state's evidence corroborated the confession in nearly every detail.

▮▮ It is a general rule that extra-judicial confessions, alone and uncorroborated, are insufficient to establish the *corpus delicti*, but slight corroboration may be sufficient. *State* v. *Blay*, 77 Vt 56, 59, 58 A 794. Evidence corroborating a confession need not independently prove the commission of the crime charged, either beyond a reasonable doubt or by a preponderance of the evidence. *Davena* v. *United States*, 198 F2d 230.

▮ It is generally held that the evidence other than the confession is not required to be such as, independently of the confession, establishes the *corpus delicti* beyond a reasonable doubt. Anno. 127 ALR 1136. See also 20 Am Jur, Evidence,

§1242, p. 1092-1094; 22 CJS, Criminal Law, §839, p. 1471-1476; Anno. 45 ALR2d, 1316.

██ ██ Here, however, robbery was no part of the body of the crime or *corpus delicti*. The body of the crime was death through criminal agency. *State* v. *Longe, supra,* 96 Vt at p. 10, 116 A at 82. V. S. 47, §2406 provides "In an indictment for murder it shall be sufficient to charge that the respondent did feloniously, wilfully and of his malice aforethought kill and murder the deceased." Where murder is charged as provided by the statute and since the statute, V. S. 47, §8241, further provides that, in case the person tried is found guilty of murder, the degree shall be determined by the jury and stated in its verdict, the statute contemplates for the purpose of such determination that evidence may be introduced showing the existence of any of the elements specified by reason of which it is murder in the first degree. *State* v. *Lescord,* 96 Vt 85, 87-88, 117 A 242. By §8240, perpetrating or attempting to perpetrate robbery is one of those elements. It follows, that proof of robbery only goes to the degree of murder and not to the proof of the criminal means by which it was committed.

The case of *People* v. *McGuire,* 9 Cal2d 399, 70 P2d 632, is much in point. That was a conviction of murder in the first degree. The homicide was committed in holding up a store during which the proprietor was shot. A confession was obtained. The claim there was, the same as here, that it was not corroborated. The revolver used was recovered from the place where the respondent had thrown it from a train window. A witness testified for the state about seeing the respondent when he threw it away and to a statement he made while doing it. The revolver, when found, contained two expended and four unexpended shells; the victim was shot twice. This evidence was held as sufficient corroboration of the confession.

*State* v. *Layton, supra,* 174 Or 217, 148 P2d 522, was a case of homicide while attempting to commit rape. It was a capital case. The victim's body was found in a river several weeks after the alleged crime. The respondent confessed. The finding of some of the torn clothing with blood stains upon it plus other evidence found at the scene of the alleged crime and

the fact that the respondent and victim were seen together when the victim was last seen, was held sufficient corroboration of the confession. See also *People* v. *Lytton*, 257 NY 310, 178 NE 290, 79 ALR 503.

The evidence that we have enumerated in regard to the robbery was sufficient to corroborate the confession in the case at bar. It can also be added that the court did not submit the case to the jury upon the robbery evidence alone, but also submitted it upon the theory of a murder committed with premeditation, deliberation and malice aforethought. There was no error in denying the motion.

### Exception 16

The respondent under this heading has included exceptions to the failure of the court to charge his requests numbered 2, 3, 4, 5 and 6 and one of his exceptions to a portion of the charge. In considering these exceptions we must have certain fundamental rules in mind.

The charge is not to be considered piece meal, but as a whole. Its substantial compliance with a respondent's request is all that is required. *State* v. *Demag*, 118 Vt 273, 278, 108 A2d 390. A literal compliance is not required. A court may select its own language and how far it shall go in elaboration of the point is within its discretion. *McKenna* v. *McDonald*, 111 Vt 60, 63, 10 A2d 208. It is not error to deny a request to charge in the terms made unless it sets forth sound law to the full extent. The fact that some sound law might be extracted from a request or that, in general terms, it may be sound law with certain qualifications is not enough. *Stevens* v. *Nurenburg*, 117 Vt 525, 536, 97 A2d 250.

Request No. 2 was, "In this state, the jury by whom a person is tried for murder, if it finds such person guilty thereof, shall state in its verdict whether it is murder in the first or second degree." The court, in its charge, correctly defined murder in the first and second degrees and told the jury the necessary elements to prove to establish each. It told the jury of the various verdicts that it might render in accordance with

what it found the facts to be. The charge substantially complied with this request.

Request No. 3 was that the punishment or sentence with respect to murder in the first degree and murder in the second degree are mandatory and are automatically imposed and the jury finding as to murder in the first degree or murder in the second degree determines the punishment or sentence. Request No. 4 was that the punishment for murder in the first degree is death and for murder in the second degree is imprisonment in the state prison for life. Request No. 5 was that the punishment or sentence for manslaughter is imprisonment in the state prison for life or for not less than one year or a fine of not more than one thousand dollars and the court, in event of such verdict, fixes and imposes what the sentence shall be. Request No. 6 was that if the verdict is not guilty by reason of insanity, the court thereupon holds a hearing to determine whether the respondent shall go at large or be committed to an institution. In short these four requests were so framed that the jury would be told what would happen to the respondent as the result of any of the possible verdicts it might render except that of not guilty.

In *State* v. *Lapan*, 101 Vt 124, 141 A 686, which was an indictment for murder, the jury requested that it be informed as to the maximum penalty for manslaughter. The trial court instructed them that they had nothing to do with the penalty and it should not enter in their consideration or discussion. This Court at pages 142-143 held that there was no error as the trial court alone was to fix the penalty within the terms of the statute. That case is controlling in regard to the exceptions to the failure to charge requests No. 5 and 6 and disposes of them adversely to the respondent.

■ V. S. 47, §8242 provides, "The punishment of murder in the first degree shall be death. The punishment of murder in the second degree shall be imprisonment in the state prison for life." This section was P. S. 5695 and read exactly as it does now. By No. 225 of the Acts of 1910, it was amended to read, "The punishment of murder in the first degree shall be death or imprisonment for life in state's prison as the jury

may determine; and the punishment of murder in the second degree shall be imprisonment in the state prison for life or for such term as the court in pronouncing sentence may fix. If the jury shall find the respondent guilty of murder in the first degree, the punishment shall be life imprisonment in state's prison unless the jury shall add to their verdict the words 'with capital punishment'." The statute as thus amended was in effect when *State* v. *Bosworth*, 86 Vt 71, 83 A 657, was tried below and heard and decided in this court. There this Court in speaking of the statute as amended said at page 75, "It was not the purpose of the Legislature to create subdivisions of the crime of murder in the first degree, to be ascertained by drawing some line of legal demarcation, and make this classification determinative of the penalty. It was left to the jury to choose the penalty for the case before them in the untrammeled exercise of a just and wise discretion. They are to be governed therein by such considerations as appeal to their own judgment and discretion upon a review of the whole case. The court is not entitled to limit them in the exercise of this discretion by instructions in any form." By No. 228 of the Acts of 1912, P. S. 5695 was amended taking out the words, "with capital punishment" thereby making the statute read as before and as it now reads in section 8242 heretofore quoted. It is plain that the legislature intended to take away from the jury any right to consider in its deliberations the question of punishment for murder in the first degree or murder in the second degree. The punishment is not for their consideration. They are to consider the case solely upon the facts in determining whether it is murder in the first or second degree.

The record shows that the respondent's counsel had informed the jury in regard to the punishment. He had at least eight times in his cross-examination of the witnesses for the state, in the presence of the jury, mentioned first degree murder and death in the electric chair. In his opening statement to the jury he told them, "It is your decision which will decide this entire matter. It will, in certain instances, fix the sentence Mr. Goyet will receive in the event you find him guilty. You will have the choice through your verdict of determining

whether he will go to the electric chair or life imprisonment, or whether he will receive some other sentence; whether he will go free or whether he will be found insane. These are the decisions you will have to make."

The respondent's counsel, by these requests, was only trying to have placed before the jury by the court in its official capacity the same information that he had already, not once but several times, communicated to the jury. Knowledge of the punishment could have been of no aid to the jury in determining the issue of whether the respondent was guilty of murder in the first or second degree. 53 Am Jur, Trial, §803.

The respondent relies upon *Waltor* v. *State*, 57 Miss 533. It is not in point here. There was no degree of murder in that jurisdiction at that time. The jury under the statute had the right, after a verdict of guilty, to fix the penalty of imprisonment for life and if they did not say so, then it was the duty of the court to impose the death penalty. Clearly, under that statute, there was a choice of penalty for the jury.

There was no error in the refusal to charge the respondent's requests Nos. 3 and 4 in regard to the penalties for murder in the first and second degree.

The court charged the jury, "You are not to concern yourself about the sentence for this offense, that is a matter for the court and not for your concern." The respondent excepted to this, "Because we say in this state the sentences or some of them are mandatory." He says in his brief that section 8242 fixes the penalty and that the foregoing was a misstatement of the law. It is apparent that the court at the place in question was talking about the penalties that would follow any of the possible verdicts that the jury might render. It immediately followed the quoted sentence by saying, "You must return the verdict which the facts you find require under the law as I have given it to you." It followed that with the five possible verdicts that the jury would be entitled to render. At another place in the charge the jury was told that the legislature had taken the responsibility of exactly specifying what the mandatory punishments shall be for either of the degrees of the crime of murder. A charge is to be considered as a whole and

not piecemeal. *State* v. *Demag, supra,* 118 Vt at 278, 108 A2d at 393. This exception is without merit.

### Exception 17

The respondent under this heading in his brief has included his exceptions to the court's failure to charge in accordance with his requests Nos. 8, 9, 10, 11, 12, 14, 15, 16 and 17 which pertain to insanity and his exceptions Nos. 6, 7, 8, 12, 13, 14, 15 and 16 to the court's charge pertaining to insanity. He says in his brief that, "While the foregoing represent many separate exceptions, they are consolidated and briefed as one under this section of the brief for the purpose of clarity and to avoid repetition because they serve one principal purpose, namely, to have the court modify and relax its present rule as to legal insanity under the circumstances of this case." The respondent, in his brief quotes part of the court's charge on the issue of insanity as follows: "To be insane in a legal sense so as to be relieved from criminal acts committed in such a state, one's mental and moral faculties must be so disordered and deranged that he cannot distinguish right from wrong or is not conscious at the time of the act he is committing; or if conscious of it and able to distinguish right from wrong, his mind and will must be governed by an uncontrollable and irresistible impulse produced and growing out of the mental disease."

The respondent then quotes in his brief his exception No. 13 to the court's charge and which repeats the charge that we have just quoted, then adds: "Because we say that the court should also include in that, if the act is the result or product of mental illness or disease, then he is also insane so as to relieve him from criminal responsibility." He then says in his brief, "All of the other exceptions both to the court's charge and failure to charge were designed to have the court charge in substance that in addition to the right and wrong rule and the irresistible impulse test, a respondent is not criminally responsible if the alleged crime was the product of mental disease or mental defect." Some of his requests specifically spell that out. Thus, under his briefing, it is evident that when we have disposed of his exception 13 to the charge, we will have disposed

of his other exceptions under this heading to the failure to charge and to the charge as given.

The effect of mental capacity upon criminal responsibility for criminal acts has been a problem of the criminal law for many, many years. The discussion of the problem has received fresh impetus because of the case of *Durham* v. *United States*, 1954, 94 US App DC 228, 214 F2d 862, 45 ALR2d 1430. This case set forth the mental disease or mental defect test that is referred to in the respondent's requests and his exception No. 13.

There is an annotation in 45 ALR2d at 1447 following the opinion in the Durham case. The editorial comment at p. 1448 mentions the criminal law theory and what most psychiatric disciplines assume. It then goes on to say, "This divergency of viewpoint, together with the general 'patient-treatment' orientation of the doctor as against the 'social protection' attitude of the lawyer, probably accounts for the incessancy and acrimony of the medical and psychiatric attacks upon the legal attempts to deal with the problem of determining mental capacity for criminal acts." It there cites in the note *Halloway* v. *United States*, 80 US App DC 3, 148 F2d 665.

Referring further to the annotation, the concept of insanity as an excuse for conduct which would otherwise be punishable as a crime developed early in the history of English law. Ability to distinguish between right and wrong at the time of the act charged was soon recognized as the test to be applied. This right and wrong test became known as the M'Naghten rule because of its formation in an advisory opinion of the Judges in the M'Naghten case. The annotation goes on to state that while this is often referred to as the right and wrong rule or test, it should be observed that it actually has two branches; that the accused is to be held not criminally responsible where he does not know the nature and quality of his act as well as where he does not know right from wrong with respect to that act. It states that this is now the sole test in most common law jurisdictions. There are then listed 29 states plus Hawaii and England as applying the rule. In six states, four of which are included in the 29, it is embodied in statutes.

Several states apply the right and wrong rule in conjunc-

tion with the "irresistible impulse" test, "which goes upon the theory that insanity may affect the volitional as well as the cognative faculty." It is then accordingly held "that the accused should be regarded as not criminally responsible where, because of his mental disease or defect, he either cannot distinguish right from wrong, or if able to make the distinction, cannot choose between them." The annotation then lists fourteen states and the United States that apply the irresistible impulse rule or test. Vermont is there listed. The annotation then states, "It cannot be said, however, that there is observable any general trend toward the adoption of the 'irresistible impulse' modification of the M'Naghten rule and that test has been rejected in a number of recent cases where it has been advanced." Then it lists 13 of the 29 states cited that have the right and wrong rule that have refused to include the irresistible impulse test. It then concludes that in spite of criticism, there seems to be no discernable tendency to vary the right and wrong test. See also Buffalo Law Review, Vol. 4, 320-321.

 Vermont has adhered to and recognized the right and wrong rule in conjunction with the irresistible impulse test since as early as 1871. It first applied them in a suicide case in which recovery on an insurance policy was involved. *Hathaway's Admr.* v. *National Life Ins. Co.*, 48 Vt. 335, 355. This Court had occasion to review the irresistible impulse test in *State* v. *Blair*, 118 Vt 81, 99 A2d 677. In *State* v. *Kelsie*, 93 Vt 450, 108 A 391, this Court had occasion to review the law in regard to mental capacity to commit a crime. There, we said at page 452, "The test of the law in all cases is: Did the accused, as applied to the act in question, have the mental capacity to understand the character, consequences and quality of such act, and successfully resist the impulse to do it?" See *State* v. *Anderson*, 119 Vt 355, 125 A2d 827, 829, 834.

 Alabama refused in 1945 to enlarge its rule to include one who has a psychopathic personality as insane, still adhering to the right and wrong rule. *Reed* v. *State*, 246 Ala 363, 20 S2d 528, 531. A subnormal mentality is not a defense to a charge of crime unless the accused is by reason thereof unable to distinguish between right and wrong with reference to the particular

act in question. *People* v. *Jenko*, 410 Ill 478, 102 NE2d 783, 885.

 The charge that the court gave in the case at bar on insanity as relieving the respondent from his act correctly set forth the law as this court has approved it and stated it *State* v. *Blair*, supra, 118 Vt at p. 96, 99 A2d at 685; *State* v. *Stacy*, 104 Vt 379, 410, 160 A 257, 747; *Doherty* v. *State*, 73 Vt 380, 383, 50 A 1113. Shall we now change it?

In *Durham* v. *United States, supra*, 94 US App DC at 241, 214 F2d at 874, 45 ALR2d at 1445, upon which the respondent heavily relies in speaking of the rule to be applied in future cases the court said, "It is simply that an accused is not criminally responsible if his unlawful act was the result of a mental disease or mental defect. We use 'disease' in the sense of a condition which is considered capable of either improving or deteriorating. We use 'defect' in a sense of a condition which is not considered capable of either improving or deteriorating and which may be either congenital or the result of injury or the residual effect of physical or mental disease. Whenever there is 'some evidence' that the accused suffered from a diseased or defective mental condition at the time the unlawful act was committed, the trial court must provide the jury with guides for determining whether the accused can be held criminally responsible. We do not, and indeed could not, formulate an instruction which would be either appropriate or binding in all cases." The court went on to suggest an instruction which it said would in some way convey to the jury certain things for their consideration in reaching various possible verdicts. In that suggested instruction, it further said, "Thus your task would not be completed upon finding, if you did find, that the accused suffered from a mental disease or defect. He would still be responsible for his unlawful act if there was no causal connection between such mental abnormality."

The Harvard Law Review in Vol. 68, 365-366, in speaking of the Durham case, has the following to say, "Although the Durham test permits the jury to consider every aspect of the defendant's mental condition, it does not furnish a standard

for measuring how serious the 'mental disease' must be to relieve defendant from responsibility; but presumably the disease should have progressed to a reasonably serious state. The court's definition of disease as a 'condition capable of improving or deteriorating' apparently serves only to differentiate 'disease' from 'defect', nor does the court explain what degree of causal connection between defendant's abnormality and his act is necessary for an acquittal but presumably this condition must be substantial."

What is meant by, 'some evidence' as the court used it in the Durham case? If the progress of the mental condition has reached a reasonably serious state, it would become the matter of expert testimony. No layman serving on a jury would know. That develops another confusing issue, subject, without doubt, to violent disagreement. Also in connection with causal connection; is it sole cause, proximate cause or substantial cause? This leads, again, to something beyond the knowledge of a jury of laymen. It injects another issue into the case upon which there would be, without doubt, a violent disagreement in the testimony.

In that connection, the following comment is pertinent: "Yet it may be not too presumptuous to conclude that no test truly superior to those already devised will be forthcoming until the various schools of psychiatry reach substantial agreement among themselves as to their own terminology so that laws and decisions made in recognition thereof will become of practical and efficient administration." Buffalo Law Review, Vol. 4, p. 325.

An article in Vol. 65 of The Yale Law Journal, 761, 779-780 on Psychiatry and Criminal Responsibility in speaking of the Durham rule has this to say; "There are several serious difficulties with the rule. First it vies in vagueness with the Royal Commission's general question, offering only the faintest hint of direction to the jury in its search for the facts relevant to responsibility. The jury must make determinations about degrees of impairment on disease that puzzle the experts themselves. But the emphasis of the Durham test is on the question of causation; and here the jury can do no more than speculate. And finally the Durham test ignores cognition; it ignores the

rational element of purposive conduct, or at best enunciates it under a specious mantle of verbal imprecision; it ignores the question that is crucial from the perspective of the law— whether the accused was competent to make the relevant moral decision."

We now take up some of the evidence in the instant case on mental capacity. Two psychiatrists testified for the respondent and two for the state. The two for the state were Dr. Chittick, Superintendent of the Vermont State Hospital and Dr. Forrest, its senior physician and psychiatrist at the Vermont State Prison. The respondent was sent to the Vermont State Hospital for observation on September 16. There he was observed and tested by these two witnesses. The four psychiatrists all testified that the respondent was sane at the time of the homicide. Dr. Chittick and Dr. Forrest testified that the respondent was not suffering from any mental disease or illness at the time of the homicide.

One of the psychiatrists who was a witness for the respondent testified that the respondent was suffering from mental illness or disease and that the shooting was the product of the "mental turmoil that Goyet was in at that time, and to a considerable extent, for a period of time prior to the meeting with Webber" and "that it was motivated largely by Goyet's internal emotional turmoil" and "these are very difficult terms to explain" and "that, as a psychiatrist, I could not and would not incarcerate a person, that it is the psychiatrist's function only to make recommendation into proper channels."

The other psychiatrist used by the respondent as a witness testified that Goyet was suffering from a severe mental illness. He defined mental illness as follows, "Mental illness is a general term used to indicate any of the various persistent abnormalities of thinking, feeling and behavior, the symptoms of which are determined by emotional conflict and precipitated by the individual's faulty attempts at adjustment to the stresses and strains of his particular environment." In answer to a further question he said, "I feel that the shooting was motivated or determined by the emotional conflicts from which he had long been suffering."

The foregoing shows the difficulty with the term, "some

testimony"; also the difficulty with a determination of what is meant by "mental disease" and its explanation to a jury of laymen and further the difficulty with the term "causal connection."

It is quite probable that the respondent was in a "mental turmoil" or "emotional conflict" or both at the time in question. He was A.W.O.L. from the Army for the fifth time. He had reason to know what that would mean when he returned. He was "fed up" with the service. He accidentally met his wife by correspondence and she wrote him while he was in Korea. They had been married only ten months and the first day that he was home this time, his wife informed him "She was going out on me." They had an argument about that.

The instant case is one for murder, the Durham case was for house-breaking. The law and the courts are concerned with responsibility for such acts as well as responsibility for the breach of any duty prohibited by the criminal law. If the courts are to adopt what has been aptly termed "diminished responsibility" it is logical that it must apply not only to all major crimes but to minor ones as well.

Indiana, like Vermont, is one of the jurisdictions that have applied the M'Naghton right and wrong rule in connection with the "irresistible impulse" test. Anno. 45 ALR2d 1453. In a recent case, *Flowers* v. *State*, Ind, 139 NE2d 185, the accused, by his requests, like the respondent in the case at bar, sought to establish a new test for unsoundness of mind in criminal causes, such as was established by *Durham* v. *United States, supra*, 94 US App DC 228, 214 F2d 862, 45 ALR2d 1430. The Indiana Court for reasons to which we subscribe, set forth in the opinion, 139 NE2d 192-194, refused to adopt the test set forth in the Durham case.

It does not seem necessary or advisable to discuss the question further. The subject is endless and the articles pertaining to it are legion. We adhere to our present law, i. e. what is known as the right and wrong rule in conjunction with the irresistible impulse test as charged by the court in the instant case. It is well established and workable and the respondent has offered no cogent reason why we should discard it

and substitute another. The exceptions briefed under this heading are not sustained.

## Exception 18

Here again, under this heading in his brief, the respondent has grouped his separate exceptions to the failure of the court to charge the jury in accordance with his requests Nos. 18, 19, 20, 21 and 22. He also includes two of his exceptions to the charge. The five requests all pertain to instructing the jury as to certain matters to be considered by it in determining whether or not the confession, verbal statements, the re-enactment of the crime and the taking of the blood sample were voluntary on the part of the respondent.

In considering these requests, we revert to some of the rules that we stated in regard to requests that we considered under exception 16. It is not error to deny a request that is in part unsound. *Stevens v. Nurenburg, supra,* 117 Vt 525, 536, 97 A2d 250.

Request No. 18 includes that if the jury find the written confession, any verbal statements, the re-enactment scene and the taking of the blood sample were obtained from the respondent without an attorney being present such is a circumstance which may be considered by the jury as to whether or not such confession or statement or re-enactment was voluntary. Requests Nos. 19, 20 and 21 also include the confession, any statements made by the respondent, the re-enactment scene or the blood sample without the respondent being told that he was being held on a charge of first degree murder and the consequences of making any such statement, confession or performing the re-enactment scene or permitting his blood to be taken, then such failure might be considered by the jury as a circumstance in determining whether anything said or done in connection therewith was voluntary.

The only verbal statement that the respondent made that was before the jury was the one that we considered under exception 7. This was to the admission of the answer of the respondent to a question asked him on the porch of the

Valley residence after the gun had been taken from him, "Do you know what we are looking for you for?" The answer was "Yes". We said there no question was made by the respondent that the answer was not voluntary. The statements by the respondent to the troopers in the automobile during the ride from Barton to St. Johnsbury were excluded by the court and were not before the jury for consideration. The respondent briefs these requests as pertaining only to the confession, taking of the blood sample and the re-enactment scene. The requests contained additional matter of statements made by the respondent being voluntary. There were no statements involving that issue in the evidence that was presented to the jury. Since the requests contained an issue that was not before the jury and were, therefore, in part unsound, there was no error in denying them. *Wilson* v. *Dyer*, 116 Vt 342, 348-349, 75 A2d 677.

Request No. 22 was that if the respondent at the time he made the confession, furnished blood or performed the re-enactment scene, was not advised that Webber was dead, then such failure to so advise him might be considered by the jury as a circumstance in determining whether whatever the respondent did in connection therewith was voluntary. It appeared at the time of the preliminary hearing before the court, with the jury not present, in connection with the admission of the statements made by the respondent to the troopers during the trip from Barton to St. Johnsbury, that before they left the porch at the Valley residence and after the other question had been answered, the respondent was also asked, "Why did you kill him?" and he answered, "I don't know." This shows that the respondent was then advised that Webber was dead. This question and answer was excluded by the court at the same time it excluded the statements made to the troopers in the car. The jury therefore had no knowledge that the respondent had been advised that Webber was dead. The respondent is not in a position to complain about information that had been excluded at his request or ask that the jury consider something that was not before them in the evidence and which he had kept from them by objecting to it as evidence. The exception is not sustained.

However, because of the nature of this case, we give the exceptions further attention. The respondent briefs them upon the same grounds that he briefed exception 11 in connection with the admission of the confession and exception 12, relating to the admission of the blood sample and exception 13 relating to the admission of the testimony regarding the re-enactment of the crime. He relies upon the same United States cases that he there relied upon as holding that the confession, re-enactment and giving of the blood were not voluntary. It is not necessary to repeat all that we said there, particularly under exception 11 or the authorities that we cited holding that the matters he there raised and he here raises by these exceptions did not render these matters involuntary. He is on no stronger ground here than he was on where those exceptions were disposed of adversely to him.

The exceptions to the requests to charge now under consideration involve the question whether or not the trial court, after having determined that a confession is voluntary and admitted it in evidence, should then in its charge submit that same question to the jury. In the instant case, after the preliminary hearing before the court and ruling that the confession was admissible, the jury heard substantially the same evidence that was presented to the court at the preliminary hearing. Moreover, the court in its charge submitted to the jury the question that it had already passed upon, i. e., was the confession voluntary or involuntary. The respondent cannot complain as that was a benefit awarded to him in the charge.

■■ ■■ Under this same heading, the respondent has briefed two exceptions to the charge. These exceptions are not available. No grounds were stated nor were any alleged defects in the charge pointed out. A trial court is entitled to be informed of the fault found with its instruction so that it may have a fair opportunity to pass judgment upon it and, if an objection appears to be well founded, add to or modify the charge. *State* v. *Noyes, supra,* 111 Vt 178, 181, 13 A2d 187. However, these exceptions are so closely related to the exceptions that we have considered under this heading for failure to charge certain requests, that they are controlled by what we

have said in our disposition of those exceptions. None of the exceptions briefed under this heading are sustained.

## Exception 19

The respondent took an exception to that part of the court's charge wherein the court said in part, "this case is not simply an investigation into who killed Archie Lee Webber, Jr." Again no grounds were stated in taking the exception or any alleged defect pointed out. The exception is not available here. *State* v. *Noyes, supra.* However, as this is a capital case and the state has not raised the foregoing ground, we have examined the exception. A charge is not to be taken piece meal but as a whole, *State* v. *Demag, supra,* 118 Vt 273, 278, 108 A2d 390. The court in the same paragraph to which the exception was taken charged, "Whether * * * * the state of Vermont has established the guilt of the respondent of the homicide charged beyond a reasonable doubt." Further, an examination of the entire charge shows that the court charged as to all the essential elements of the crime and their proof beyond a reasonable doubt. There is nothing about the language here excepted to, which taken with the charge as a whole shows that the respondent was prejudiced thereby. The exception is without merit.

## Exception 20

The respondent under this heading has briefed two exceptions to the court's charge. (1) He excepted to that part of the court's charge reading as follows; "But the circumstances must be proved beyond a reasonable doubt and must be such as will lead the guarded discretion of a just and reasonable man to the conclusion that the crime has been committed and that the respondent is guilty of its commission You must be careful, therefore, not to indulge any inference or presumption that does not in your mind necessarily arise from the facts established by the evidence." The ground stated was "that the court should have included the expression 'beyond a reasonable doubt' in that part which relates to the subject that the respondent is 'guilty of its commission'. In other words, he says

in his brief that even though the words reasonable doubt were used, they should also have been used following the phrase, "that the respondent is guilty of its commission."

An examination of the charge discloses that the court correctly defined reasonable doubt and that at the place in question, the court was talking about circumstantial evidence and that part of the charge to which the exception was taken was only part of the sentence. The court just before the word, "But" in that part of the charge quoted in the exception, used the following, "You are persuaded beyond a reasonable doubt of the respondent's guilt." Thus it used the words "reasonable doubt" twice in the same sentence. The respondent says it was error because it was not used a third time. The court further charged correctly in regard to circumstantial evidence. Also, later the court summed up the state's duties and elements that had to be proved beyond a reasonable doubt. What we said under exception 19 applies here in regard to a charge not being considered piecemeal. It is inconceivable that the jury could have been misled or received any false impression as to the degree of proof because the court used "reasonable doubt" only twice in the one sentence instead of three times. No error appears.

■ (2) The respondent excepted to that portion of the court's charge as follows, "The law does not require that each particular incriminating fact which may aid the jury in determining that the accused is guilty shall be proved beyond a reasonable doubt. The doubt that will justify an acquittal is a doubt upon all the evidence that he is guilty." Here again, no grounds were stated or any alleged defect pointed out, so the exception is not available. However, for the reasons stated in considering exception 19, we have examined it. The part of the charge here to which the exception is taken is almost identical with the language questioned in *State* v. *Anderson*, 119 Vt 355, 367, 125 A2d 827, 834. What we said there applies here and disposes of the exception adversely to the respondent.

### Exception 21

The respondent excepted to the following portion of the

court's charge. "The respondent has not taken the witness stand in this case. The statute makes him a competent witness at his own request and not otherwise; and the fact that he has not availed himself of this statutory permission and has not testified is not to be considered by you as evidence against him." Here, again, no grounds were stated nor any alleged defect pointed out so the exception is not available. *State* v. *Noyes, supra,* 111 Vt at p. 181, 13 A2d at 188. However, for the reasons heretofore stated and because of its importance to the trial court, we have given it study and attention.

 The respondent claims in his brief that it is in violation of V. S. 47, §2412 as amended by No. 98 of the Acts of 1955. This involves the construction of that act. Before proceeding further we should have in mind certain rules pertaining to statutory construction. The underlying rule of statutory construction is to discover the intent of the Legislature in doing what it has done or attempted. *Town of Randolph* v. *Montgomery,* 109 Vt 133, 136, 194 A 481. It is the fundamental rule of statutory construction that the intention of the Legislature must be ascertained and given effect. *Pelton's Exr.* v. *Dumas,* 117 Vt 13, 16, 84 A2d 408. The intention of the Legislature constitutes the law. *State Highway Board* v. *Gates,* 110 Vt 67, 73, 1 A2d 825; *Riley* v. *Riley's Estate,* 114 Vt 297, 300, 44 A2d 153. When words of common use are found in a statute, they are to be taken in their ordinary sense, unless a contrary intention clearly appears. *State* v. *Levine,* 117 Vt 320, 322, 91 A2d 678. The construction of a statute which will lead to an absurd consequence must be avoided, if possible. *Russell* v. *Lund,* 114 Vt 12, 22, 39 A2d 337. Among other aids that may be employed in determining the intention of the Legislature are consideration of the history of the statute's enactment and the trend of previous legislation. *Gould* v. *Towslee,* 117 Vt 452, 459, 94 A2d 416.

What is now V. S. 47, §2412 as amended by No. 98 of the Acts of 1955, stems from No. 40 of the Acts of 1866 as follows, "In the trial of complaints, informations, indictments and other proceedings against persons charged with crimes or offenses, the person so charged, shall at his own request and not other-

wise, be deemed a competent witness, the credit to be given his testimony being left solely to the jury, under the instructions of the court, but the refusal of such person to testify shall not be considered by the jury as evidence against him."

In *State* v. *Cameron,* 40 Vt 555, trial was by jury in 1867, the year following the enactment of the statute. The respondent did not take the stand and testify. The trial court charged the jury, that the fact of the respondent's not taking the witness stand should not be taken against him, the law only giving him the privilege of choice; and if the respondent did not choose to testify, it must not be taken against him. This Court in that case said, at page 565, "We see no error of law in the charge of the court upon the subject of the respondent's omission to testify on his own behalf. The court was bound to tell the jury they were not to consider this against the prisoner, and this was done." This Court in *State* v. *O'Grady,* 65 Vt 66, 69, 25 A 905, decided in 1892, approved a charge of like import and in so doing referred to the Cameron case.

The matter of the charge of the court was again before this Court in *State* v. *Bolton,* 92 Vt 157, 102 A 489, and in *State* v. *Rossi,* 92 Vt 187, 102 A 1030, where the respondent did not testify and the jury was instructed that the failure of the respondent to testify was not to be taken against him and the charges there given were approved.

We have here called attention to these four cases because at the time they were decided, the law was as originally enacted and as it appeared in P. L. 2383. By No. 52 of the Acts of 1935, P. L. 2383 was amended. The amendment did not change the first part of the section in regard to a person so charged being "at his own request and not otherwise a competent witness," but following those words the change was made and the following substituted, "the credit to be given to his testimony being left solely to the jury under the instructions of the court but the failure of such person to testify may be a matter of comment to the jury and the jury may draw reasonable inferences therefrom." This amended section became V. S. 47, §2412 without any change, except to insert a period instead of a comma after the word "witness" and use the word

"the" as the beginning of a new sentence, thereby separating the section into two sentences.

*State* v. *Stacy*, 104 Vt 379, 160 A 257, was a capital case, decided in 1932. The respondent testified in that case. The trial court, after telling the jury that the statute made the respondent a competent witness, in his own behalf, went on to say: "The credit to be given his testimony rests solely with you, and you are to consider it in view of his interest in the result of the trial, and give it the weight to which you think it is fairly entitled. It is obvious under the statute that if a respondent goes upon the stand, it is because he desires and intends that his evidence shall make in his favor, shall shield him from the consequences of the charge that is made against him. This develops exactly the interest that he has. He has the utmost interest that a party can have. He has all the interest that can originate and be inspired by the peril in which he is and by the charge that is made against him when he is brought to trial; all the interest that a party can have in not being convicted of the crime with which he is charged. That is the position in which the person charged with crime stands when he goes upon the stand as a witness." The respondent took an exception to the charge. This Court at pages 409-410 approved the charge as given.

This same charge was before this Court again in *State* v. *Bean*, 119 Vt 184, 122 A2d 744. In that case the respondent testified and the court charged the jury in the same language as the court did in the Stacy case. The respondent excepted on the ground that the charge was prejudicial to him. We held that part of the charge to which the exception was taken was not prejudicial and the exception was not sustained. We agreed, however, with the respondent that part of the charge gave the state an advantage and suggested at page 187 in future trials that part be omitted.

We now take up the case of *State* v. *Baker*, 115 Vt 94, 53 A2d 53. That was an arson case, decided in May 1947, when the statute P. L. 2383 as amended by No. 52 of the Acts of 1935 was in effect. The respondent did not testify. During the argument of the State's Attorney, he commented about the failure of the respondent to testify and the trial court charged

the jury that "although the respondent does not have to take the stand unless he sees fit to do so, if he fails to testify, that may be a matter of comment to the jury and the jury may draw reasonable inferences therefrom." It should be noted that the comment was by the prosecuting officer and that the court made no comment about the failure of the respondent to testify, only telling the jury the law in the exact words of the statute.

The respondent excepted to the argument and to the charge. His claim was that the statute allowing comment contravened Chapter I, Article 10 of our Constitution. "That in all prosecutions for criminal offenses, a person hath a right to be heard by himself and his counsel; * * * * nor can he be compelled to give evidence against himself; * * * *." A majority of this Court in an opinion by Mr. Justice Sherburne, later Chief Justice, noted that the American Law Institute in 1931 approved a resolution that "the Judges, the prosecuting attorney and counsel for the defense may comment on the fact that the respondent did not testify." The opinion then went on to show that in 1931 and again in 1934 the American Bar Association recommended a law allowing comment and that the Vermont Bar Association adopted a recommendation that P. L. 2383 be amended as was done by No. 52 of the Acts of 1935. The majority opinion, after reviewing the few pro and con authorities, held that the law as amended was constitutional. Chief Justice Moulton wrote and filed a dissenting opinion and Mr. Justice Jeffords, now Chief Justice, also did so.

Next we note the case of *State* v. *Levine, supra,* 117 Vt 320, 91 A2d 678, decided in 1952. There the respondent did not testify and the State's Attorney in no uncertain terms commented upon his failure to do so. The respondent excepted. This Court said at page 326, "The language used by the State's Attorney was crude and unbecoming before a mixed jury of ladies and gentlemen but his inference was warranted and the exception is not sustained."

Thus a respondent was caught between the "upper and nether millstones." If he did not take the stand and testify, his failure to do so was subject to all the comments to which an aggressive and zealous State's Attorney could subject him

without endangering the State's case to a reversal in case of a conviction. On the other hand, if he did testify, he subjected himself and his testimony to the charge of the trial court approved in State v. Stacy, supra, 104 Vt at 409, 160 A at 269. In other words, as expressed in the dissenting opinion of now Chief Justice Jeffords in State v. Baker, supra, 115 Vt at 116, 53 A2d at 66, it placed the respondent in a dilemma, "The right of comment would compel every defendant in a criminal case to take the witness stand and testify and thereby subject his whole life's record to the most relentless cross-examination, or face the alternative of having the prosecutor in the most violent manner, parade before the jury the claimed fact that the defendant is guilty because he chose to stand upon his constitutional rights."

Without doubt this situation led to the passage of No. 98 of the Acts of 1955. By that V. S. 47, §2412 was amended to read as follows: "In the trial of all complaints, informations, indictments and other proceedings against persons charged with crimes or offenses, the person so charged shall, at his own request and not otherwise, be deemed a competent witness. The credit to be given his testimony shall be left solely to the jury, under the instruction of the court but the failure of such person to testify shall not be a matter of comment to the jury by either the court or the prosecutor and shall not be considered by the jury as evidence against him."

It seems plain from the history of the legislation and our decisions in connection therewith, that it was the intention of the Legislature, by this amendment to remove the dilemma to which we have referred in which the respondent was placed by the 1935 amendment. Referring to that amendment, Chief Justice Moulton in his dissenting opinion in State v. Baker, supra, 115 Vt at 113-114, 53 A2d at 64, said, "Before its amendment P. L. 2383 required that juries be instructed that the refusal of a respondent to testify must not be considered by them as evidence against him. It cannot be assumed that this admonition was not given due weight and attention by those to whom it was addressed." It should be noted that the opinion in State v. Bean, supra, 119 Vt. 184, 122 A2d 744, in which we suggested a change in the charge approved in State v. Stacy,

*supra,* was not handed down until after the statute was amended in 1955.

The respondent claims in his brief that the wording of the statute prohibits the court from making any comment—in fact from mentioning anything about the failure of the respondent to testify. How is the jury to know that such failure shall not be considered as evidence against the respondent unless the court tells it so in the language of the statute? Was it the intention of the Legislature, that a jury should be allowed, in its deliberations to speculate about it? Undoubtedly, the members of the jury, or some of them would do so and such failure would be a matter of discussion in the jury room. We do not think that the Legislature had that intention and thus, without any instruction from the court, leave the matter open for the jury with no guide as to the law. Otherwise the amendment would not correct a situation that was prejudicial to the respondent.

■ If the court makes no reference whatever to the failure of the respondent to testify not being considered as evidence against him, the jury would be likely to consider such failure prejudicial against him. *State* v. *Carlisle,* 28 SD 169, 132 NW 686, 688; *State* v. *Wisnewski,* 13 ND 649, 102 NW 883.

"Comment" as a verb: "To meditate upon, explain, to make or write comments on or upon", as a noun: "Act or instance of commenting, remark or criticism." Webster's New International Dictionary.

The respondent in his brief cites several cases from other jurisdictions. We have examined all of them. Most of them have to do with remarks of the prosecuting attorney or failure to give an instruction in regard to the matter when requested and the statutes are different from ours so they are of no particular help and distinguishable. See 53 Am Jur, Trial, §699; 3 Am Jur, Appeal & Error, §1099, p. 626-627; Anno. 84 L Ed 261.

We have found two cases, however, that seem to be helpful. In *State* v. *Pierce,* 56 Minn 226, 57 NW 652, 1065, a request was made for an instruction calling attention that the neglect of the defendant to take the stand should not create any pre-

sumption against him as provided in the statute. It was held that there was no error in refusing to give it. There, however, the statute was in one important and material provision different from ours. There it provided that "nor shall such neglect be *alluded to* or commented upon by the prosecuting attorney or by the court." (Emphasis supplied)

In *Furguson* v. *State*, 52 Neb 432, 72 NW 590, 592, the statute provided, "nor shall any reference be made to, nor comment upon such refusal or neglect." The court, without any request, instructed the jury, "You are instructed that the defendant has not testified in his own behalf in the case as he had a lawful right to do. Nothing must be taken against him because he has not so testified." Held there was no error, the court saying in part, "If the jury in the case at bar had not been so directed, they might have regarded as an incriminating circumstance the fact that he had not been sworn. The instruction instead of being prejudicial to the accused was favorable to him."

It would lead to an absurd result or consequence to say if a respondent takes the stand and testifies, the court shall then instruct the jury in regard to the weight that it shall give his testimony; but if he does not testify, even though the statute says that it shall not be considered by the jury as evidence against him, the court has no right to so instruct them.

 We hold that it was proper for the court to direct and admonish the jury in the language of the statute as was done in the instant case and the instruction as given was proper. The exception is not sustained.

## Exception 22

The respondent took the following exception to part of the court's charge: "We except to so much of the court's charge that is substantially to the effect that no particular question has been made about the cause of death nor is the evidence conflicting, because we say there is conflicting evidence of the number of bullets and the number of bullet holes."

In connection with this exception, the respondent lays great stress in his brief upon the testimony of Dr. Coburn in

regard to his preliminary examination of Webber at the hospital as soon as he was admitted and before he died. The respondent says that it was error for the court to say in this particular instance that the evidence was not conflicting because it was as to the number of times that Webber was shot, that is, whether two or three times. He says it was a misstatement of the evidence and therefore prejudicial.

An examination of the charge on this particular question shows that the court was there talking about the cause of death and that Webber was unlawfully killed. The respondent in taking his exception only referred to part of the charge on this particular subject. Here, again, the charge is not to be taken piece meal. The evidence was not conflicting in regard to the cause of death. Dr. Spelman, who performed the autopsy, and Dr. Coburn, who was present when it was performed, testified that Webber died from gunshot wounds into the head damaging the brain.

Nor was the evidence conflicting in regard to the number of times that Webber was shot. The respondent in his brief only quotes part of Dr. Coburn's testimony. In fact, he omits half of the answer from which he quotes. It developed at the autopsy that there were both entrance and exit wounds. Dr. Coburn in testifying about his preliminary examination at the hospital from which the respondent quotes part of the answer testified, "I thought he was suffering from what I thought at the time was three bullet wounds of the head, rather than a hit and run accident." Again he testified, "At the time, I thought both of them were entrance wounds. It was my opinion he had been shot three times." It is plain that he was referring to his opinion formed at the time of his preliminary examination. He was not asked for and did not express any opinion that was formed after seeing the autopsy. From testimony of the wounds found at the autopsy, both entrance and exit wounds, it is a fair inference that his original opinion had changed.

The court did not make an erroneous statement of the evidence in regard to the cause of death. Moreover, the court in this same connection charged the jury that it must be satisfied beyond a reasonable doubt that Webber was un-

lawfully killed and that the respondent did the killing. The charge taken as a whole correctly stated the law in this connection and there is no fair ground for saying that the jury was misled by it. Therefore, it ought to stand. *Cole* v. *North Danville Coop. Creamery Ass'n.*, 103 Vt 32, 45, 151 A 568. The exception is without merit.

### Exception 23

After the jury had returned a verdict of guilty of murder in the first degree, the respondent made a motion to set it aside on the grounds that it was contrary to the evidence, not justified by the evidence and not supported by the evidence. The motion was denied and exceptions allowed on all grounds.

The respondent has briefed these exceptions on the grounds that without the confession and evidence of the re-enactment there was not sufficient evidence to justify a verdict of murder in the first degree and both of these items were not competent evidence; that if they were competent evidence they were not corroborated by required evidence and should not have been submitted to the jury; that having been submitted to the jury, the evidence and circumstances surrounding it was such that the jury should not have found it to be voluntary and that the alleged robbery which formed the basis of a first degree verdict only came from the mouth of the respondent in his confession and this was received in evidence without the corroboration required by law to render it admissible against him. These same claims were the basis of the various exceptions of the respondent which we have already considered. What we have said in regard to them, disposes of these grounds adversely to the respondent.

The respondent, in support of his motion, also claims in his brief that the evidence concerning the mental condition of the respondent required that the motion be granted because he did not possess the guilty mind which the law contemplated which justifies a first degree verdict. Here again, what we have said in connection with his exceptions in regard to mental condition disposes of this claim adversely to the respondent.

In connection with the motion generally and the

respondent's exception to its denial, he tenders the transcript. The test is whether the state introduced evidence fairly and reasonably tending to show the respondent's guilt or in other words, whether the jury on the evidence was justified in finding the respondent guilty beyond a reasonable doubt. *State* v. *Pierce*, 103 Vt 383, 387, 154 A 675; *State* v. *Perras*, 117 Vt 163, 167, 86 A2d 544. Our recapitulation of the evidence in disposing of the various exceptions shows that it meets this test. The motion was properly denied.

There was no error and the respondent takes nothing by his exceptions. *Judgment on the verdict not having been entered below, judgment of guilty of murder in the first degree is rendered and entered here upon the verdict of the jury. Let sentence pass and execution thereof be done.*

**Holden, J.** (dissenting). Respondent's exceptions 9, 11 and 14 point out to me deviations from established principles of criminal procedure.

Exception 9. The jury was permitted to examine, consider and speculate concerning the mutilated, unexpended bullet included in State's Exhibit 32. When the trial court indicated its concern for the offered exhibit, the State made an offer to the Court and the respondent to connect the exhibit by scientific proof that would associate the bits of lead taken from the questioned bullet, with the fragments of lead removed from the wound inflicted on the victim, State's Exhibits 25 and 33. This promised crucial connection in the proof was never accomplished. The offensive exhibit remained in the case as an instrument for conjecture. See *State* v. *McDonnell*, 32 Vt 491, 535. Even though the offer was made at the bench, with the right purpose to bring it out of earshot of the jury, it was made in the presence of the jury, with, at best, but a few feet separating court and counsel from the jury. I am unable to affirmatively say that the challenged exhibit worked no injury to the accused. Such affirmation is the requirement of our cases, *State* v. *McDonnell, supra; State* v. *Meader*, 54 Vt 126, 130; *State* v. *Hopkins*, 50 Vt 316, 330; *State* v. *Longe*, 96 Vt 7, 10, 116 A 81; See also *Paul* v. *Drown*, 108 Vt 458, 462, 189 A 144, 109 ALR 1085, concerning a prejudicial offer.

Exception 11. The trial court excluded the oral confession without assigning reason for its rejection. Whether the ruling emanated from considerations of law or discretion does not appear. Whatever reasons moved the court to the exclusion of the oral confession, it was ruled out of the case. After such a ruling, to justify the admission of the subsequent written confession, it became incumbent upon the State to establish that the influences that produced the original confession had been removed. The evidence required to support the subsequent confession, in this situation, must be strong and clear. 3 Wigmore, Evidence, §855, page 335; *State* v. *Ellis*, 294 Mo 269, 242 SW 952, 24 ALR 682, 689; *Edwards* v. *State*, 194 Md 387, 71 A2d 487, 493. See also *State* v. *Carr*, 37 Vt 191, where this principle is recognized and the evidence intervening the first and second confession was held sufficient to meet the test.

The record, in so far as I can perceive, reveals but the single factor of the removal of handcuffs from the confessor to justify the severance of his two incriminating statements. In my judgment, this fact, standing alone, fails to discharge the burden which the law casts upon it.

Exception 14. V. S. 47, §2478 requires the separate examination of witnesses in a criminal trial on the request of either the respondent or the prosecuting attorney. In this instance the request came from both sources. The statute employs the word "shall"; thereby the implication of a mandate arises and the import is restrictive. *Snyder* v. *Central Vermont Railway*, 112 Vt 190, 193, 22 A2d 181.

In the absence of a statute, there appears to be a difference of judicial opinion whether separate examination of witnesses is a demandable right or is available only in the trial court's discretion. 3 Wigmore, §1839, page 357. The wording of our statute seems to remove these differences for this jurisdiction. Upon the request of either party it provides, "The court shall have the witnesses examined separately and apart from each other."

At the last October Term of this Court, it was held that the violation of the mandate of the common law, supported by the statutory oath prescribed for court officers to hold the jury

together in a criminal cause, was improper and constituted reversible error unless the respondent consented to the jury's separation. *State* v. *Anderson,* 119 Vt 355, 125 A2d 827, 831. To my mind, the same reasoning applies with equal force here. I differ with my associates on the existence of such consent. The majority opinion states that the request for an opportunity to examine the data contained in Dr. Forrest's medical file followed by the grant of that request constituted a waiver of his right to have the witness excluded, during the examination of all but psychiatric witnesses.

"A waiver is the voluntary relinquishment of a known right. To establish it, there must be shown an act or omission on the part of the one charged with the waiver fairly evidencing an intention permanently to surrender the right in question. It may be expressed or implied. But if it is of the latter class, caution must be exercised both in proof and application. The facts and circumstances relied upon must be unequivocal in character. Silence, alone, is never a waiver. It is only where there is an obligation to speak, that it has that result. When it is in derogation of a statutory right, it is not favored, and will not be inferred from doubtful acts." Powers, C. J. in *Dunbar* v. *Farnham,* 109 Vt 313, 322-323, 196 A 237, 241, 114 ALR 996.

The request of the respondent for access to data from Dr. Forrest's file is, at best, "a doubtful act" upon which to attach a waiver. The respondent's resistance to the trial court's ruling, followed by the court's allowance of an exception to the respondent "on all grounds", repels the idea of voluntary consent to the relinquishment of an important statutory right. And such a statutory right, even by implication, should not be made the instrument of trade for factual data in a criminal prosecution.

The final area of my departure from the majority opinion relates to the treatment afforded the controversial case of *Durham* v. *United States,* 94 US App DC 228, 214 F2d 862, 45 ALR 2d 1430. I concur with the majority, that there was no error, in this instance, in the failure of the trial court to charge the requests submitted by the respondent, extracted verbatim from the Durham decision. I believe the charge of the court upon

the issue of criminal responsibility was correct, fair and appropriate to the expert psychiatric testimony appearing in the case.

I feel it should be pointed out, however, that the charge given went substantially beyond the instructions that appear in the majority opinion. I believe the instructions in full, which the trial court afforded to the jury on the issue of insanity, are not inconsistent, nor out of harmony with the decision in *Durham* v. *United States, supra,* and *State* v. *Pike,* 49 NH 399, 407-408. The jury was instructed, "Insanity may be general or it may be partial. The degree of it must have been so great as to control the will of its subject and to have taken from him the freedom of moral action." In my judgment, this instruction conveys substantially the same thought, expressed in the words of the Durham case "that an accused is not criminally responsible if his unlawful action was the product of mental disease * * * ."

The record discloses that the respondent's expert witnesses on the issue of insanity frequently referred to the impulsive nature of the respondent's act. In response to that evidence, the court instructed the jury, "The mind must be so overcome that it has no power to resist the insane impulse to commit the deed so that the action is the direct and immediate consequence of the result of insanity, in short, that the deed is an insane act in respect to which the reason is powerless." This portion of the court's instruction was obviously consistent with the testimony of the psychiatrists, that the respondent's mental condition was such that he was compelled to yield to the "irresistible impulse to kill the victim" and that it was impossible for him to resist the impulse to carry out the act in question. The so-called "irresistible impulse" rule had particular application to the testimony then before the jury.

On the evidence, the court was under no obligation to use the term "mental defect" requested by the respondent, in the sense that it is employed in the Durham case. Under the definition given to that term by the Durham opinion, a mental defect is a condition considered incapable of improvement of deterioration. It is there regarded as a static and permanent impairment of the mind. The evidence of the psychsatrists

called by the respondent, was that he suffered from "incipient Schizophrenia" capable of progressing into severe stages and diagnosed as a severe mental disturbance as distinguished from a physical or brain disturbance, and that further mental deterioration would follow.

In the Durham decision, the so-called "irresistible impulse" rule was regarded as an inadequate guide to the determination of criminal responsibility, for it carried with it the misleading implication that the diseased mental condition produces only sudden or spontaneous inclinations to commit unlawful acts, *Durham* v. *United States, supra*, 94 US App DC at 239, 214 F2d at 873, 45 ALR2d at 1444. Such an implication was particularly inappropriate in the case then before that court, where the offense charged was housebreaking.

The misleading connotation of the rule referred to in the Durham case has been expressly removed from the standard of criminal responsibility applied in this jurisdiction by what is said in *State* v. *Blair*, 118 Vt 81, 96, 99 A2d 677, 686, "The irresistible impulse must be one produced and growing out of mental disease and not from an episode of emotional excitement." The irresistible impulse instruction, thus qualified, is consonant with what is said in *Durham* v. *United States*.

The opinion of the majority of the Court states that we have been called upon to accept the "Durham rule" and its acceptance is denied.

I believe there is danger in endeavoring to catalog rules in regard to criminal responsibility. In *Snyder* v. *Commonwealth*, 291 US 97, 114, 54 S Ct 330, 335, 78 L Ed 674 at 682, Justice Cardozo wrote of the "tyranny of labels" and pointed out that they were a source of perversion in constitutional theory and observed: "Out of the vague precepts of the Fourteenth Amendment, a court frames a rule which is general in form,though it has been wrought under the pressure of particular situations. Forthwith another situation is placed under the rule because it is fitted to the words, though related faintly, if at all, to the reasons that brought the rule into existence." This well-founded observation applies with equal force to the conflicting theories that have arisen in the treatment of the subject of criminal insanity. In this case, the Durham decision has been

treated as a rule. If I read the Durham case correctly, it states a concept but does not undertake to establish a rule, for it is there stated, "Whenever there is 'some evidence' that the accused suffered from a diseased or defective mental condition at the time the unlawful act was committed, the trial court must provide the jury with guides for determining whether the accused can be held criminally responsible. We do not, and indeed could not, formulate an instruction which would be either appropriate or binding in all cases." Thus, an instruction to be afforded the jury in connection with a criminal act involving a relatively lengthy period of deliberation and execution is not exactly appropriate to a criminal act that is impetuous and swift in its conception and execution, impulsive in nature.

The Durham case states the concept that criminal insanity is incapable of precise definition. The plethora of conflicting opinion, both legal and psychiatric, manifests the same truth. The way to the true ascertainment of criminal responsibility should not be encumbered by any single definition or label.

Vermont went beyond the rigid confines of the so-called McNaghten rule in *Doherty* v. *State*, 1901, 73 Vt 380, 50 A 1113. The Court in an opinion by its Chief Justice Taft, in considering a petition for a new trial on the issue of insanity, found itself in the position of a jury. In disposing of the issue then before it, the Court recognized that insanity may be general or partial but whatever its degree, criminal responsibility will not attach to one suffering from such disease if the mental illness controls the will of the subject and takes from him the freedom of moral action, thereby destroying the voluntary character of the offense. This was reported as a legal guide followed by the Court, in reaching its ultimate decision.

Then, as now, the ascertainment of the truth of criminal responsibility must rest on the determination of the issue of fact,—whether the offense is the product of a guilty or criminal mind, or whether it be the result of the operation of a mind so infected by disease that guilt cannot be assigned to it. In the case before us the jury was afforded reasonable guides for fixing criminal responsibility in accord with the expert testimony

before them. They were left free to discern the mental capacity of the respondent to commit the criminal deed with which he stood charged.

I am at variance with the majority opinion in so far as it attempts to accept or reject standardized rules, involving legal definition of criminal insanity that will unnecessarily restrict the law of this jurisdiction in finding the truth of criminal responsibility in any particular case.

The weight and integrity of psychiatric testimony is not for the court. It is for the jury, in the same measure as their control of medical testimony in search of the truth on an issue of physical disease or injury.

The opportunity for enlightened progress in the field of psychiatric jurisprudence should not be unnecessarily trammeled or restricted by the arbitrary selection of a single rule or definition. The law has wisely preserved flexibility to allow the jury a wide freedom of action in dealing with "proximate cause", "reasonable doubt", "the prudent man" and in supplying other guides for fixing responsibility, both civil and criminal. I believe the same freedom of action should be preserved for the jury's determination of criminal responsibility where insanity is the issue.

I reluctantly take a position apart from the majority of the court. My reluctance is generated from a deep-seated respect for the considered and more experienced judgment of my associates. I appreciate too, that the verdict of the jury, upon a crime so savagely brutal, should not be rejected for other than the most compelling reasons. Such reasons appear to me, by way of Respondent's Exceptions 9, 11 and 14.

"A criminal, however shocking his crime, is not to answer for it with forfeiture of life or liberty till tried and convicted in conformity with law." *People* v. *Moran*, 246 NY 100, 158 NE 35, 37. This is the precept of *State* v. *Brewster*, 76 Vt 341, 352, 40 A 1037, 42 LRA 444, and *State* v. *Frotten*, 114 Vt 410, 416, 46 A2d 921. It is my view that a new trial is required in order that a verdict may be achieved, free from the shadow of legal infirmity.

I am authorized to state that Mr. Justice Hulburd is in accord with that part of this memorandum that is in concur-

rence with the majority, relating to the charge of the trial court on the matter of criminal responsibility.